TAYLOR BAY PROTECTIVE ASSOCIA-
TION, Calvin Covington, Morgan Wil-
liam Berry, Edward C. Fitzhugh and
Bay Fitzhugh, Plaintiffs,

v.

William D. RUCKELSHAUS, In His Offi-
cial Capacity as Administrator, U.S.
Environmental Protection Agency;
Dick Whittington, In His Official Ca-
pacity as Regional Administrator, Re-
gion VI, U.S. Environmental Protection
Agency; Village Creek and White River
Levee District of Jackson County, Ar-
kansas; Mayberry Levee District of
Jackson County, Arkansas; John O.
Marsh, Jr., In His Official Capacity as
Secretary of the Army, U.S. Army
Corps of Engineers; and Lt. Colonel
Larry S. Bonine, In His Official Capac-
ity as District Engineer, Little Rock
District Corps of Engineers, Defend-
ants.

No. LR–C–82–17.

United States District Court,
E.D. Arkansas, W.D.

May 17, 1988.

Bay Fitzhugh, Augusta, Ark., O.H. Storey, III, Little Rock, Ark., for plaintiffs.

Charles Banks, U.S. Atty., Little Rock, Ark. by Katherine Savers McGovern, Asst. U.S. Atty., Fred Pickens, Jr., Newport, Ark., Daniel G. Steele, Dept. of Justice, Environmental Defense Section, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

This proceeding was instituted by the Taylor Bay Protective Association (Association), a non-profit corporation, incorporated for the purpose of restoring and improving the "environment [and the] quality of Taylor Bay in order to provide the public a high-quality recreation area" in Woodruff County, Arkansas. Plaintiffs, Morgan William Berry and Bay Fitzhugh, are members of the Association.

Defendants, Village Creek and White River Levee District of Jackson County, Arkansas, and Mayberry Drainage District of Jackson County, are improvement districts (Improvement Districts). Improvement Districts are jointly responsible for the operation and maintenance of a pumping station in issue in this proceeding as more fully described and discussed hereinafter.

Federal defendants are Anne Gorsuch and her successor, past and present administrators of the United States Environmental Protection Agency; Dick Whittington, Regional Administrator of the United States Environmental Protection Agency, Region VI; John O. Marsh, Jr. and successor, Secretary of the Army; Larry S. Bonine, District Engineer, Little Rock District of Corps of Engineers. In essence, the case involves a flood control project authorized by the United States Government in Jackson and Woodruff Counties, Arkansas, known as the Village Creek, White River and Mayberry Levee Districts Pumping Station and Drainage Ditch Project (Village Creek Project).

The following issues are to be resolved:

A. Whether the United States Army Corps of Engineer (Corps) violated the National Environment Policy Act (NEPA) by not preparing an Environmental Impact Statement (EIS) with reference to the construction of the Village Creek project.

B. Whether the Corps violated the Fish and Wild Life Coordination Act in failing to consult with the United States Fish and Wildlife Service (FWS) in the construction of the project.

C. Whether plaintiffs are entitled to relief against the Corps for the alleged failure to require local sponsor (Improvement Districts) of the project to acquire sump or ponding area for the project.

D. Whether the discharge from the leveed area into Taylor Bay constitutes a common law nuisance warranting relief against Improvement Districts under Arkansas law.[1]

## BACKGROUND INFORMATION

Taylor Bay is a water course connected to the White River north of the Town of Augusta within Woodruff County, Arkansas.[2] Taylor Bay prior to 1970, was the

---

[1]. On June 21, 1985, the Court entered a summary judgment in behalf of federal defendants regarding the issues of: (1) whether there was a violation of the Clean Water Act because of the alleged failure of the Environmental Protection Authority to issue a national pollutant discharge elimination system permit for the project, (2) alleged failure of the Corps to conduct a project review in accordance with the Administrative Procedure Act, and (3) whether plaintiffs are entitled to relief against the Corps on the theory of common law nuisance pursuant to the laws of the State of Arkansas.

Plaintiff, Morgan William Berry, has advised the Court that he has elected to waive any claim that he might have for a "taking" and in "lieu thereof is basing his claim on a continuing nuisance and a request for abatement."

[2]. Taylor Bay constitutes part of what is considered Mississippi Delta country. The lower most portion of the Taylor Bay water course is

principal recreation resource within Woodruff County, Arkansas, as well as adjoining counties. These outdoor recreational activities included fishing, hunting, water skiing, boating and picnicing.

The Watershed of Taylor Bay prior to 1940, consisted of the Taylor Slough Watershed and contained approximately 40 square miles. In 1940, the northern 27.5 square miles of Taylor Slough Watershed was enclosed within a levee. The levee also enclosed the Mill Creek Watershed which consisted of 22.2 square miles north of the Taylor Bay Watershed. Another Watershed, the Drummond Lake Watershed, consisting of 2.2 square miles in the northern portion of the leveed area, was also enclosed within the levee.[3] At the time of the enclosure of the area in 1940, interior drainage of Mill Creek and Taylor Slough was provided through the installation of concrete box culverts with electrically operated slide gates. Each culvert measured 8 feet by 8 feet. Two of these culverts were located where Mill Creek drained through the levee into the White River and three of these culverts were located in the levee on Taylor Slough. During flooding or high water on the White River, when gravity drainage could not occur, the culverts were closed to prevent a backflow of water from the White River and Taylor Slough into the leveed area. Aside from constructing levees, other projects undertaken by the United States Government and the Improvement Districts, in an effort to eliminate the adverse effects of flooding, included raising, enlarging and correcting levees and extending them to higher ground, establishing drainage ditches and culverts in the area in order to expedite drainage, through the various watersheds into the White River. However, despite these numerous projects, interior flooding continued to cause damage to the agriculture lands within the leveed areas. Consequently, during the

latter part of the 1950's, the Corps studied various proposals for additional flood control work. The Corps recommended two plans to the United States Congress to cope with the flooding problem. The Corps, essentially, recommended, first, which has been characterized as Plan I, that further clearing and enlarging of the then-existing channels and additional excavation for new channels in certain areas be undertaken. Secondly, the Corps recommended, which has been characterized as Plan II, the work suggested in Plan I and further recommended the construction of 180,000 gallon per minute pumping station to facilitate drainage from Taylor Slough into Taylor Bay during periods of high water. The Corps also discussed a proposal designated as Plan III, but did not recommend Plan III to Congress which included the work set forth in Plan I and provided for the construction of a 300,000 gallon per minute pumping station.

Congress authorized Plan I in the River and Harbor Act of July 14, 1960, Pub.L. No. 86–645, 74 Stat. 480, but did not make a decision on the pumping station. However, the Corps was directed to re-study the proposal under Plan III. On August 24, 1962, following a re-study of Plan III, the Corps submitted its revised plan to Congress and Congress authorized the revised project in the Flood Control Act of 1962, Pub.L. No. 87–874, 76 Stat. 1173.

In June of 1963, the revised project design plan was completed and titled "White River Watershed–Village Creek, White River and Mayberry Levee Districts in Jackson and Woodruff Counties, Arkansas". The Corps approved the project in March, 1966, and the project was named "White River Watershed–Village Creek, White River and Mayberry Levee District in Jackson and Woodruff Counties, Arkansas, Pumping Station and Drainage Project."

known as Big Taylor Bay or Big Bay while the upper part is known as Little Taylor Bay or Little Bay or Taylor Slough. The Taylor Bay water course is approximately eight miles long by five miles at its widest point. The water level of the Taylor Bay stream is governed by the river stage of the White River.

3. The area includes approximately 34,000 acres of agricultural land that are protected by the levee from floods.

Construction of the project commenced on July 1, 1968. Essentially, this included the clearing and enlarging of approximately 19 miles of existing channels and construction of about two miles of new channels in the Taylor Slough and Mill Creek watersheds; the establishment of a channel to carry water from Mill Creek to Taylor Slough and then to Taylor Bay, when high water would block the flow of water from Mill Creek through the western culverts into the White River; and a channel running into Taylor Slough which would carry water from Mill Creek, Taylor Slough and another area designated as Border Slough. The pumping station project was completed in early November, 1970, and was immediately turned over to the Improvement Districts for operation in accordance with an operation and maintenance manual prepared by the Corps.[4]

While construction in the leveed area was taking place, a supplement to the project design plan was prepared by the Corps pursuant to a new 1968 study to determine the capacity of Big Bay and Little Bay to contain drainage from the project area. In this study, the Corps recommended eighteen cross sections runs through Little Bay from the southern culverts to the upper end of Big Bay for the purpose of studying outlet channel conditions. The results of the study indicated that Big Bay, which resembles a lake during high river stages, had the capacity to contain any expected flow from the project. However, the Corps recommended that an area of approximately 2.3 miles of the

channel in Little Bay which lies below the proposed pumping station needed to be cleared because of the existence of brush, large trees which was a narrow area and was a hindrance to good drainage because of the lack of sufficient capacity to accommodate water during flooding. The clearing project was completed sometime in July, 1971.

## DISCUSSION

### I. VIOLATION OF THE NATIONAL ENVIRONMENT POLICY ACT

Title 42 U.S.C. § 4332 provides in relevant part:

... (2) All agencies of the federal government shall—

.    .    .    .    .

(C) Include in every recommendation or report on proposals for legislation and other major "Federal Actions" significantly affecting the quality of human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action

.    .    .    .    .

■ Plaintiffs argue that the Corps violated the National Environment Policy Act (NEPA) which was enacted by the Congress on January 1, 1970, by not preparing

---

**4.** Prior to completion of the pumping station in 1970, runoff from lands within the leveed area ponded inside the levee when the culvert gates were closed during floods on the White River. When the White River receded, about half the runoff in the leveed area was drained through the Mill Creek outlet and about half was drained through the Taylor Slough drainage structure. When the pump station and interior drainage improvements were added, a diversion ditch was provided from Mill Creek to Taylor Slough. During gravity drainage conditions (low White River), an average of about 40 percent of the Mill Creek drainage is diverted to Taylor Slough and then flows through Taylor Bay to the White River. When gravity drainage is blocked due to a high White River, all the Mill Creek flow passes through the diversion ditch to

Taylor Slough, and drainage from the Mill Creek and Taylor Slough drainage areas is pumped from a common sump area over the levee into Taylor Bay and then flows to the White River.

The pumping facility consists of three pumps each with a capacity of 100,000 gallons per minute. Since the installation of the pumping facility, at the Taylor Slough outlet, the Taylor Bay fishery has deteriorated because of sediment and turbid water. The area contributing to this condition, allegedly, is approximately sixty-five (65) square miles. Forty-eight (48) square miles of this area lie upstream of the pumping station and seventeen (17) square miles below the pumping station or downstream.

an Environment Impact Statement (EIS) in conjunction with the construction of the Village Creek project. Plaintiffs readily admit that the Village Creek project was under construction at the time NEPA became effective and that the failure to prepare an EIS may "be moot within the framework of granting relief," but, plaintiffs argue, a finding by this Court that an EIS should have been prepared is appropriate "since had one been prepared, the nuisance condition might have been avoided."

On the other hand, federal defendants argue that plaintiffs' request for relief is "plainly moot and this Court lacks jurisdiction even to consider it." Consequently, argue federal defendants, plaintiffs have failed to establish a NEPA violation.

The Court is persuaded that federal defendants' argument has merit and, therefore, this count will be dismissed with prejudice.

As federal defendants argue, plaintiffs are seeking NEPA relief sixteen years after the completion of the Village Creek project and the termination of any federal involvement with reference to this project. Indeed, once the project was completed, it seems readily apparent that a belated EIS would have little or no value and any claim for injunctive relief is without merit because of the mootness of any alleged issue. The purpose of an EIS statement is to assist decision-makers with environmental disclosure sufficiently detailed to aid in the decision whether to proceed with a proposed project in light of environmental consequences and to make available to the public information of proposed project's environmental impact and encourage public participation in the development of that information. See, *State of Minnesota by Alexander v. Block*, 660 F.2d 1240, 1259 (8th Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1645, 71 L.Ed.2d 876 (1982). Moreover, as federal defendants argue, the Village Creek project was not something that the Corps constructed in secrecy, but, on the contrary, was a project that had

been scrutinized by the Congress and was subject to numerous reports and public hearings over a relatively long period of time. The public, as well as all interested state and federal agencies, knew or should have known about the proposed project and had ample opportunity to make their views known regarding any impact on the environment. In essence, the Court finds that although NEPA had not been enacted, at the time the Village Creek project was started, the Corps, in soliciting and considering the views of the public as well as federal and state agencies, manifested its concern about the environmental consequences. For example, the United States Fish and Wildlife Service (FWS) was aware of the project and was afforded the opportunity to offer comments to the Corps before construction commenced. Pursuant to FWS comments, the Corps installed water control structures at Pickett, White, Bear and Newton Lakes.

Finally, the Court is not persuaded that the Corps is guilty of any bad faith in the continued construction of the project after NEPA became effective, which would serve as a basis for requiring an EIS even though the project has been completed. As observed previously, the Corps actively sought input from the public in general and both federal and state agencies specifically in endeavoring to structure a solution to flooding problems in the Village Creek area.

## II. FAILURE TO REQUIRE SUMP OR PONDING AREA

▪ Plaintiffs contend that federal defendants failed to construct the Village Creek project in accordance with the project plans and design; and that the Corps, specifically, failed to require or insure that the Improvement Districts acquire title to two sump or ponding areas— one area located north of the pumping station in Taylor Slough consisting of approximately 660 acres and the other located near Mills Creek consisting of 200 acres.[5] In

---

5. The sump or ponding area was recommended by the Corps. The sump would afford the Improvement Districts the legal right to pond wa-

ter, during flooding or high water, at all times of the year in order to allow silt and sediment to settle out of floodwater before the water was

essence, plaintiffs are asking this Court to compel federal defendants to enforce the assurances given by the Improvement Districts to Congress that a sump area would be acquired, at the Improvement Districts' own expense. This assurance was a condition precedent to the United States Government's involvement in the Village Creek project.[6]

The federal defendants argue that plaintiffs have utterly failed to demonstrate any entitlement to the requested relief because, assuming plaintiffs possessed a cause of action under the Administrative Procedure Act, such purported claim is barred by the six year statute of limitations (28 U.S.C. § 2401(a)); that an injunction compelling the Corps to require the Improvement Districts to acquire the sump areas would be meaningless since the area in question is already serving as a sump area; and that the federal defendants cannot be compelled to bring a legal action against the Improvement Districts because the executive branch "has exclusive authority and absolute discretion to decide whether to prosecute a case." *U.S. v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974).

As previously noted, the Village Creek project was authorized and funded by the Congress pursuant to Pub.L. No. 87–874. Pub.L. No. 87–874 specified that the project should be constructed as recommended in House Document No. 577 which contain the following relevant provisions as recommended by the Corps to Congress:

RECOMMENDATIONS—The board therefore recommends modification of the existing project for flood control for Village Creek, White River and Mayberry Levee Districts, Jackson and Woodruff Counties, Arkansas, to provide for a pumping station with a capacity of 300,-000 gallons per minute at the Taylor Slough outlet, all generally in accordance with the plan of the district engineer and with such modifications thereof as in the discretion of the Chief of Engineers may be advisable at a cost, in addition to that of the authorized associated channel improvements, estimated at $1,047,000 for construction: Provided that prior to construction local interest make a cash contribution equal to 17.2% of the federal construction cost of the pumping station, an amount presently estimated at $211,-000; and give assurances satisfactory to the Secretary of the Army that they will:

a. *Provide without cost to the United States all lands, easements, and rights-of-way necessary for the construction of the project.*

b. *Provide lands or easements for necessary pondage areas, and hold and save the United States free from claims as a result of flooding from interior drainage during the operation of the project* ...[7]. (Emphasis added)

Sometime during the early part of April, 1962, the Improvement Districts by and through their attorney, Fred M. Pickens, Esq., advised the Corps that if the Corps constructed the project, the Improvement Districts would "provide, without cost to the United States, all land, easements and rights-of-way necessary for the construction of the project." Subsequently Congress authorized the project. In 1966, the Corps sent to the Improvement Districts' attorney several topographic maps, designating certain lands which the Improvement Districts were to acquire for sump or ponding purposes. Later, the attorney for

---

pumped into Taylor Bay. The Improvement Districts did not acquire the sump area. However, the area has been used for ponding over the years when crops are not in cultivation on the ponding area.

**6.** Federal defendants argue that the unrestricted use of the area as a sump area has ripened into a possessary right by way of adverse possession. If, as plaintiffs argue, that during the crop growing season, the registered owners make use of these lands it is questionable whether the Districts have had exclusive and undisturbed possession for seven years as required under Arkansas law in order to assert the claim of adverse possession. *See:* Ark.Code Ann. § 18–61–101 (1987); *Harrison v. Collins,* 247 Ark. 210, 444 S.W.2d 861 (1969).

**7.** Title 33 U.S.C. § 701c requires the local sponsor of a flood control project to give the United States assurances, commonly known as "local assurances", that the sponsor will independently carry out certain steps related to the project.

the Improvement Districts advised the Corps that the Districts had acquired title to these lands. However, the evidence discloses clearly that the Districts never acquired a record title or easement to these lands.

The Court is persuaded that federal defendants' argument to the effect that plaintiffs have failed to demonstrate any entitlement to the requested relief has merit and the Court dismisses this count with prejudice for the following reason:

Assuming that plaintiffs have standing in which to require the federal government to take the requested affirmative action, such a cause would have accrued sometime during 1962, when the attorney for the Districts advised the Corps that the Districts had acquired title to the sump area. Plaintiffs' action was not instituted until approximately twenty (20) years later, in 1982. The Court is persuaded that the six-year statute of limitations under 28 U.S. C. § 2401(a) is dispositive of this issue.

### III. FAILURE OF CORPS TO CONSULT WITH THE FISH AND WILDLIFE SERVICE

█ Here, plaintiffs argue that the Corps violated the Fish and Wildlife Coordination Act, 16 U.S.C. § 662, by not consulting with the United States Fish and Wildlife Service inasmuch as the Village Creek project affected a waterbody.

Federal defendants argue that the consultation requirement of the Fish and Wildlife Coordination Act has been "subsumed within those of NEPA" and plaintiffs have failed to demonstrate a violation of NEPA.

In disposing of this count, the Court deems it sufficient to hold that in view of this Court's finding earlier that the Corps solicited the assistance of both private entities and public agencies, including the Fish and Wildlife Service, in structuring plans to cope with flooding problems in the Taylor Bay area, plaintiffs have failed to demonstrate a violation of the Fish and Wildlife Coordination Act. Accordingly, this count is dismissed with prejudice.

█ Plaintiffs also contend that the Corps failed to construct the Village Creek project in accordance with project plans. Specifically, plaintiffs argue that the Corps failed to clear all trees from the banks of Mill Creek as called for under the project plans. While the evidence disclosed the existence of Cypress trees in close proximity of Mill Creek, the Court is not persuaded that plaintiffs demonstrated, by a preponderance of the evidence, that these trees interferred with the flow of water in Mill Creek or the Village project in the slightest degree, or that the trees were actually within the banks of Mill Creek. In essence, plaintiffs failed to show that the Corps breached, in any way the project plans. Therefore, this claim is also dismissed with prejudice.

### IV. NUISANCE

█ Under Arkansas Law, a nuisance is regarded as that activity that arises from the unreasonable or unwarranted use by one of his own property resulting in injury or detriment to the right of another, or to the public in general, to the free and untrammeled use of his property. *City of NewPort v. Emery,* 262 Ark. 591, 559 S.W. 2d 707 (1977); *Arkansas Release Guidance Foundation v. R.J. Needler,* 252 Ark. 194 (1972). Moreover, a nuisance may be either private, public or mixed. *Miller v. Jasinski,* 17 Ark.App. 131, 705 S.W.2d 442 (1986). In essence, a public nuisance is one in which conditions injure or endanger the public health, safety and welfare. Conduct that is essentially a public nuisance may, at the same time, constitute a private nuisance and is actionable as such by an individual in his private capacity. *Ozark Poultry Products, Inc. v. Garman,* 251 Ark. 389, 472 S.W.2d 714 (1971).

In *Ozark, supra,* the Arkansas Supreme Court made the following observation:

The fact that a nuisance is public does not deprive the individual of his action in cases where, as to him, it is private, and obstructs the free use and enjoyment of his private property.

After carefully considering the record and argument of counsel, the Court has no

difficulty in finding that because of the conduct and action of the Improvement Districts in the operation of the Village Creek project, a nuisance has resulted in the nature of both a public and private one. This nuisance, in essence, is and has been a continuing one since the early 1970's.

Testimony from inhabitants of the Village Creek area who have personal knowledge of both Little Taylor Bay and Big Taylor Bay, as a regional recreational area, testified that during the 1960's there were no "long-lasting water quality problems" even though there was some land clearing on the Taylor Bay peninsula;[8] that it was only after the pumping station became operational in 1970 that the problems associated with silt and sediment surfaced and reduced fishing and other recreational activities to a bare minimum. In other words, siltation and turbidity from the leveed area by way of Taylor Slough culverts and the pump station as well as runoff and White River overflow from the area between Little Bay and the White River (downstream from the leveed area) have contributed to the diminishment of the fishery stock and other recreational activities such as swimming, skiing, boating and hunting on the Taylor Bay water stream. Contemporaneously, the aforementioned problems constitute a private nuisance as to plaintiffs Berry and Fitzhugh who have sustained and are still sustaining special, direct and substantial damages to their individual property bordering both Little Bay and Big Bay.

Plaintiff, Fitzhugh, in his individual capacity, has demonstrated, by a preponderance of the evidence, that he is the owner of approximately 800 acres of land that lies within 75 yards of Little Bay. Two hundred acres of this tract of land is cleared. Fitzhugh, aside from being deprived of free access to his property by motor boat by way of Little Taylor Bay, has sustained the following inconveniences and damage to his lands because of the erosion, silt and sedimentation in the Village Creek project.

1. Cypress trees on property immediately adjacent to Little Bay have fallen over along the banks of the stream and some of these trees have actually fallen into Little Bay as a direct consequence of soil being washed from the tree roots.

2. Mud and silt have been washed directly upon Fitzhugh's property resulting in the obstruction to the use and access to lands adjacent to Taylor Bay. Fitzhugh testified that, in his judgment, his property has depreciated in value to the extent of $9,500.00. While it is generally recognized that an owner may offer testimony regarding his personal views regarding the value of his assets, the Court is not in a position to credit the alleged monetary loss because of the following: Fitzhugh has not had the property appraised since his acquisition of the title to the entire tract of land, nor has he made an effort to dispose of any of these lands by way of sale, as a matter of fact, he has no intention of disposing of any of the property. The Court is persuaded that the monetary figure cited by Fitzhugh is one based upon speculation and conjecture. The proper measure of damages appears to be the difference between the fair market value of the property immediately prior to and after the events involved here. An alternative method would be the depreciation in the rental value of the property. See: *Southern Ice and Utilities Co. v. Bryan,* 187 Ark. 186, 58 S.W.2d 920; *Czarnecki v. Bolen–Darnall Coal Co.,* 91 Ark. 58, 120 S.W. 376.

3. Cattle pastured on lands near Little Bay have been fenced in in order to avoid loss of cattle in the mud and silt adjacent to the pastured lands. This precautionary measure has resulted in the establishment of a water pump and line by Fitzhugh in order to water his cattle and as such, the cattle have been deprived of water directly from Little Bay.

---

**8.** Federal defendants contend that the major source of the sediment in Taylor Bay is derived from overflows from the White River that "cut across the peninsula south of the pump station"; that the peninsula has been cleared of vegetation and, as such, the farm lands in the area are the source of the sediment.

Plaintiff, Morgan William Berry, owns approximately two acres of land immediately adjacent to Little Bay which was acquired for the specific purpose of camping, hunting and fishing. Because of the siltation and sediment problems, Berry has not realized the full and complete enjoyment of the recreational activities contemplated. Moreover, at the time Berry acquired the property, it was his intent to subdivide this land into lots and offer these lots for sale. Because of the problems involved with silt and sediment, the property, in all likelihood, cannot be put to the full use that he intended.

The Court is persuaded, and so finds, that the direct proximate cause of the problems registered by plaintiffs is due essentially to the following factors:

1. The improper use of the pumping facility by the Improvement Districts to cope with high water. In other words, the Improvement Districts were instructed not to operate the pumping facility when gravity flow was a sufficient means to cope with high water in the project. On the contrary, the pumping station has been employed when the White River stage has been below the suggested starting point, namely: elevation 196, and when gravity drainage was possible when the river stage was above elevation 196.[9]

2. Failure of the Improvement Districts to make use of the sump or ponding area at all times during the year in order to permit the settlement of silt before water is pumped into Taylor Bay whenever the pumping facilities are used to cope with flooding or high water.

3. Lateral drainage of cultivated lands between Little Bay and the White River, during high water, causes a significant amount of silt to be discharged into Taylor Bay. The evidence reflects that landowners below the pumping facility not only engage in "poor land use practices", i.e. "pushing deep freezers and [old abandoned] cars into gullies, allowing cattle and cars to create gullies, using improper drainage structures, [employing] poor vegetative cover", but the "absence of any efforts to control erosion." The Court is not persuaded that the Improvement Districts have been alert in coping with this problem by seeking either to persuade the landowner or solicit the assistance of the United States Soil Conservation Services in the area to encourage these landowners to engage in "best management practices".

4. Because of the lack of proper and effective maintenance of the diversion ditch that extends from Mill Creek to Taylor Slough and the Mill Creek area, as well, has resulted in erosion within the ditch itself causing silt and other debris, i.e. brush, trees and logs, to discharge into Taylor Bay. This inhibits gravity drainage of high water into White River necessitating the operation of the pumping facilities.[10]

9. Charles Williams Hawks, whose father was one of the operators of the pumping facility, testified that operators of the pumps from the latter part of the 1970's to date of trial have turned the pumps on without regard to the elevation on the river side of the project. The purpose for invoking this procedure was to keep water off of the crop lands during the farming season.

The maintenance manual supplied the Improvement Districts by the Corps provides: "... To insure optimum protection against flooding, the completed system must be carefully maintained at all times and properly operated during floodperiods. Proper maintenance is imperative since extensive property damage or even the loss of life may result from the failure of a critical element of the system at floodtime. Faulty operation at floodtime can nullify the beneficial capability of the entire protective system, and may even result in damage greater than would have been experienced without the system. Proper maintenance and corrective operation of the flood-protection system require that responsible local persons have a thorough understanding of the functions of the various units of the system and the best methods of maintaining and operating the system.

"*Operation of pumps, outlet stage below elevation 196.* The pumps shall never be operated when the outlet state (water surface elevation on the riverside of the pumping station due to backwater from the White River) is below elevation 196. All runoff shall be discharged by gravity flow at the pump station outlet when the outlet stage is below elevation 196, approximately 26 feet on the Augusta gage."

10. The Corps maintenance manual delivered to Improvement Districts provides further: "*Channels and ditches.* Both banks of the channel

**1328**

During the crop growing season, the Improvement Districts avoid making use of the area set aside for ponding purposes in order not to interfere with growing crops, thus causing silt and sedimentation in large quantities to discharge into Taylor Bay. Ponding of water in the sump area at all times would permit the silt and sediment to settle out of the water before the water is discharged into Taylor Bay. Federal defendants argue that while the Improvement Districts did not acquire title to the sump area as agreed, use of the area for ponding purposes over the years may have established a right to the area by way of adverse possession. The Court is not in a position to determine whether the Improvement Districts have acquired the area by way of adverse possession since it is not clear whether the Improvement Districts have had exclusive and undisturbed possession of the area for a period of seven years, as required under Arkansas law, for one to establish a possessary right by way of adverse use and occupation. Nevertheless, the Court is persuaded that the Improvement Districts should be directed to take immediate steps to make use of the sump area at all times during the year. This may necessitate affirmative steps to acquire title or access to these lands as the Improvement Districts promised Congress as a condition to the United States Government's undertaking the project in the first place.

Having found that conditions existing in the Village Creek project constitute both a public and private nuisance and that Improvement Districts are directly and exclusively responsible for these conditions, the Court, in lieu of enjoining improvement Districts from discharging water into the Taylor Bay stream, as requested by plaintiffs, has elected to afford the Improvement Districts a reasonable period of time, namely, 36 months, to correct the conditions, as found by the Court to be the major factors contributing to the problems

in the Village Creek project. Accordingly, the Improvement Districts are directed to take the following action immediately:

1. Institute the necessary and proper steps to acquire the full and complete use of the sump or ponding areas around the year for ponding purposes. This is essentially adhering to the commitment the Improvement Districts gave Congress as a condition precedent to the United States Government's involvement in the project.

2. Solicit both Corps' and the Arkansas State Game and Fish Commission's assistance in devising means to abate the nuisance created and invoking preventive measures in order to avoid similar problems in the future.

3. Institute measures for removing the debris, silt and sediment accumulated in the Taylor Bay stream, the diversion ditch, and the Mill Creek outlet; and devise and institute reasonable maintenance procedures for the diversion ditch and streams within the Village Creek project.

4. Solicit the assistance of the United States Soil Conservation Services in seeking to persuade and induce land owners downstream from the pumping facility between Little Bay and the White River to engage in good land management practices to the end that cultivated lands will not serve as a source for silt and sedimentation that filters into Taylor Bay.

5. Institute the procedures recommended by the Corps as the means for acquiring maximum and effective results from the pumping facility. Solicit the assistance of the Corps in an effort to determine when these procedures should be modified or upgraded in order to cope with the flooding and drainage problems at Taylor Bay.

shall be patrolled during periods of high water, and measures shall be taken to protect those reaches being attacked by the formation of jams of debris. Large objects which become lodged against the bank shall be removed. The improvement channel or ditch shall be thoroughly inspected immediately following each major high water period. As soon as practical thereafter, all snags and other debris shall be removed and all damage to banks, riprap, drainage outlets, and other flood-control structures repaired".

The Court has carefully considered plaintiffs' request for the appointment of a special master to monitor any corrective work required by the Court, but the Court is not persuaded that this request has merit and, accordingly, the request is denied. However, the Court is persuaded that the Improvement Districts should be required to file a written report every six months, during the time frame allotted for abating the nuisance, setting forth in detail the affirmative steps taken to remedy the problems at Taylor Bay. The first report shall be due on November 17, 1988, and a copy of same shall be served on counsel for plaintiffs.

The Court retains jurisdiction of this proceeding during the period allotted the Improvement Districts to remedy the problems, but the action will be administratively terminated with leave afforded counsel to request the Court to restore this matter to the Court's active docket upon showing good cause.

Plaintiffs having failed to prevail on any of their claims against the federal defendants, judgment shall be entered for federal defendants. Each side, however, shall bear its own cost expended in this proceeding. In addition, federal defendants' cross-claim against Improvement Districts is dismissed.

All parties to this proceeding are directed to advise the Court, within ten (10) days from receipt of this Memorandum Opinion and Order, of any issue or issues submitted for resolution that the Court has not considered.