TAYLOR BAY PROTECTIVE ASSOC.; Calvin Covington; Morgan William Berry; Edward C. Fitzhugh; Ray Fitzhugh, Appellees,

v.

ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; Dick Whittington, in his official capacity as Regional Administrator, Region VI, U.S. Environmental Protection Agency, Village Creek and White River Levee District of Jackson County Arkansas; Mayberry Levee District of Jackson County Arkansas, Appellants.

John O. Marsh, Jr., in his official capacity as Secretary of the Army U.S. Corps of Engineers; Anthony Y. Nida in his official capacity as District Engineer, Little Rock District Corps of Engineers.

TAYLOR BAY PROTECTIVE ASSOC.; Appellant,

Calvin Covington; Morgan William Berry; Edward C. Fitzhugh; Ray Fitzhugh,

v.

ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; Dick Whittington, in his official capacity as Regional Administrator, Region VI, U.S. Environmental Protection Agency, Village Creek and White River Levee District of Jackson County Arkansas; Mayberry Levee District of Jackson County Arkansas, John O. Marsh, Jr., in his official capacity as Secretary of the Army U.S. Corps of Engineers; Anthony Y. Nida in his official capacity as District Engineer, Little Rock District Corps of Engineers, Appellees.

Nos. 88–2027, 88–2168.

United States Court of Appeals, Eighth Circuit.

Submitted March 15, 1989.

Decided Sept. 1, 1989.

Tim F. Watson, Newport, Ark., for Administrator, U.S. E.P.A., et al.

Thomas Bay Fitzhugh, Augusta, Ark., & O.H. Storey, Little Rock, Ark., for Taylor Bay Protective Assoc. et al.

* The HONORABLE EDWARD DUMBAULD, Senior United States District Judge for the Western District of Pennsylvania, sitting by designation.

Before FAGG and BEAM, Circuit Judges, and DUMBAULD,* District Judge.

BEAM, Circuit Judge.

These appeals arise out of the operation of a flood control project which allegedly caused high amounts of sediment to be deposited in a downstream watercourse. The Village Creek District, White River Levee District, and Mayberry Drainage District (Districts) appeal from a memorandum opinion and order of the district court[1] in which the court ruled in favor of the Taylor Bay Protective Association (Association) on its common-law nuisance claim. The Association appeals from an order of partial summary judgment in which the district court concluded that it could not review a report prepared by the Army Corps of Engineers (Corps). Additionally, the Association appeals from the memorandum opinion and order of the district court in which the court found that the Corps did not violate 16 U.S.C. § 662(a) (1982) and that a claim against the federal defendants for failing to ensure that the Districts acquire title to two sump areas was time-barred under 28 U.S.C. § 2401(a) (1982). We affirm.

I. BACKGROUND

The Association is a nonprofit corporation established for the purpose of restoring and improving the water quality of Taylor Bay. The Districts are improvement districts operating the Village Creek Project, which project consists of a system of levees, channels, and a pumping station. The federal defendants are as follows: Anne Gorsuch and her successor, past and present administrators of the Environmental Protection Agency; Richard Whittington, Regional Administrator of the Environmental Protection Agency, Region VI; John O. Marsh, Jr. and successor, Secretary of the Army; and Larry S. Bonine,

1. The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas.

District Engineer, Little Rock District Corps of Engineers.

The Taylor Bay Watershed is located in Jackson and Woodruff Counties, Arkansas, and consists, in part, of Taylor Slough and Taylor Bay. Taylor Slough flows primarily southward to a levee, at which location culverts and pumps are located. From this point on the levee, the water enters Taylor Bay. Taylor Bay is divided into an upper and lower portion. The upper portion, Little Taylor Bay, runs southward from the levee. It extends for approximately seven miles and enters Big Taylor Bay. Big Taylor Bay, which is considerably wider, flows southward for three miles before entering the White River.

The levee on Taylor Slough was constructed in 1940 to aid in flood control. The levee runs in a northwesterly direction from the point that the slough enters Little Taylor Bay. It encloses approximately forty-eight square miles. This leveed area is principally drained by Mill Creek and Taylor Slough, with drainage areas of approximately twenty-two and twenty-six square miles, respectively. The water in Mill Creek drains through the levee into the White River by way of two culverts. The Taylor Slough water flows into Little Taylor Bay via three culverts in the levee. The area below the levee consists of a peninsula of land of roughly thirteen square miles, bounded by Taylor Bay on the east and the White River to the south and west.

In the Flood Control Act of 1962, Congress authorized improvements to the project, which improvements were completed in 1971. The improvements included cleaning, clearing, and enlarging about nineteen miles of existing channel, constructing two miles of new channel, cleaning out approximately three miles of the channel immediately below the levee, and constructing a pumping station at the levee capable of pumping 300,000 gallons per minute. Congress also authorized the acquisition of title to a 660–acre sump area directly north of the levee and a 220–acre sump area near Mill Creek. The Districts failed to acquire title to either sump area. Prior to the completion of the project,

about one-half of the runoff from the area north of the levee drained through the Mill Creek outlet, and the remainder of the runoff was drained through the Taylor Slough culverts. When the improvements were added, a diversion ditch was constructed from Mill Creek to Taylor Slough. When the White River was low, about forty percent of the Mill Creek drainage was diverted to Taylor Slough and then into Taylor Bay. However, when the White River was high and blocked the Mill Creek outlet, all of the flow of Mill Creek was diverted to Taylor Slough. When completed, operation and maintenance of the project was relinquished to the Districts.

After the pumping station became operational, problems with sedimentation and turbidity occurred in Taylor Bay which conditions reduced fishing and other recreational activities. In 1977, due to the complaints concerning the water quality of Taylor Bay, the Corps was authorized by Congress to study the project. *See* The Flood Control Act of 1970, Pub.L. No. 91–611, § 216, 84 Stat. 1818, 1830. The section 216 study resulted in a report in which the Corps concluded that most of the sedimentation was due to drainage from the row crop farmlands below the levee or due to White River overflows. Except for recommending that some revisions be made in the pumping procedures, the Corps advised that the project should not be otherwise modified.

The Association then brought suit against the Districts and federal defendants. The Association alleged, among other things, that the operation of the project constituted a nuisance, that the section 216 report was flawed and should be reviewed by the court, that the Corps failed to consult with the U.S. Fish and Wildlife Service when it completed the improvements to the project, and requested that the Districts be ordered to acquire title to the two sump areas. Pursuant to the federal defendants' motion for partial summary judgment, the court found that it did not have jurisdiction to review the findings and conclusions contained in the section 216 report. After a bench trial, the district court determined that the Districts' opera-

tion of the project resulted in the creation of a nuisance.

On appeal, the Association argues that the report is subject to judicial review and that the Corps was negligent or biased in its preparation of the report. The Districts, on appeal, argue that (1) they are immune from liability for nuisance, (2) the district court was clearly erroneous in its finding that the District's operation of the project resulted in a nuisance, and (3) the district court's remedies are clearly erroneous. In its memorandum opinion and order, the district court also found that the attack upon the Districts' assurance that they would acquire title to the two sump areas was time-barred and that the Corps did, in fact, consult with the Fish and Wildlife Service as required by section 662(a). The Association also disputes these conclusions.

## II. DISCUSSION

### A. Section 702c Immunity

██ Before reaching the merits of the Association's nuisance claim, we first address the Districts' contention that they are immune under 33 U.S.C. § 702c (1982) from any liability arising out of operation of the project.

Section 702c provides in relevant part that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." Pursuant to this section, the district court granted the federal defendants partial summary judgment, dismissing the nuisance count against them. The Districts initially argued that as operators of the project they share the immunity granted to the United States under section 702c. However, the Districts waived this contention during oral argument. And, even if the immunity argument had not been waived, the situations to which the doctrine of shared immunity has been applied are distinguishable from the facts of this case. *See Souter v. Carruthers*, 237 Ark. 590, 374 S.W.2d 474, 475 (1964) (stating that the doctrine applies to a contractor who performs under the direct supervision of a governmental agency and in accord-

ance with the terms of its contract with that agency, absent negligence or a willful tort).

### B. Nuisance

██ The district court determined that the proximate cause(s) of the sedimentation problems in Taylor Bay were: (1) use of the pumping facility at times when it was unnecessary or improper; (2) failure to make use of the sump area at all times during the year in order to permit the settlement of silt; (3) lateral drainage during periods of high water on the land downstream from the levee; and (4) improper maintenance of Mill Creek and the diversion ditch from Mill Creek to Taylor Slough. *Taylor Bay Protective Ass'n v. Ruckelshaus*, 687 F.Supp. 1319, 1327 (E.D. Ark.1988). The Districts maintain that the clearing of downstream land exposed unvegetated soil which soil was deposited in Taylor Bay through erosion and overflows from the White River. Furthermore, the Districts insist that, contrary to the findings of the district court, they properly maintained the diversion ditch from Mill Creek to Taylor Slough, used the sump areas in their intended manner, and properly followed operating procedures for the pumping facility. Thus, the Districts argue that their operation of the project was not the proximate cause of the sedimentation and turbidity problems experienced in Taylor Bay.

The district court's findings concerning nuisance, including findings on causation, are factual determinations. *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1198 (6th Cir.1988) (footnotes omitted). We review these determinations under the clearly erroneous standard. Fed.R.Civ.P. 52(a). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety,

the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). We note that this case, to a great extent, turns on the weight to be accorded the opinions of the various expert witnesses. Questions of credibility and weight of expert testimony are for the trier of fact and will not be disturbed unless clearly erroneous. *Hamer v. City of Atlanta,* 872 F.2d 1521, 1532 (11th Cir. 1989).

The Arkansas Supreme Court has defined a nuisance as follows:

> A nuisance is an interference with the use and enjoyment of land and includes conduct on property disturbing the peaceful, quiet and undisturbed use and enjoyment of nearby property. The law is clear that equity will enjoin conduct that culminates in a private nuisance in fact where the resultant injury to the nearby property and residents is certain, substantial and beyond speculation and conjecture. The distinction between a private and public nuisance is simply the extent of the injury, i.e., the number suffering the effects of the nuisance.

*Arkansas Release Guidance Found. v. Needler,* 252 Ark. 194, 477 S.W.2d 821, 822 (1972) (citations omitted). Negligent conduct can give rise to a cause of action for a public or private nuisance. Restatement (Second) of Torts §§ 821B comment e and 822 comment i (1979). "[T]he maintenance of the nuisance must be the natural and proximate cause of the injury." *Bellflower v. Pennise,* 548 F.2d 776, 778 (8th Cir.1977) (citation omitted). Proximate cause is "a cause which, in a natural and continuous sequence, produces damage and without which the damage would not have occurred. * * * [I]f two or more causes work together to produce damage, * * * each of them [is] a proximate cause." *Worth James Constr. Co. v. Herring,* 242 Ark. 156, 412 S.W.2d 838, 841–42 (1967) (setting forth the Arkansas jury instruction on proximate cause). With the foregoing principles in mind, we examine the evidence adduced at trial regarding each factor cited by the lower court as a proximate cause of the sedimentation.

The district court determined that the pumps were operated contrary to the instructions provided in the Operation and Maintenance Manual. *See* plaintiff's exhibit 16. The Districts contend that this finding was predicated on the testimony of Charles Hawks, the operator of the pumps, and that Hawks' testimony did not reveal that the pumps were improperly utilized. Hawks testified that he did not activate the pumps until the sump level reached elevation 196.5, as the manual directed. Record at 647. However, Hawks also stated that cropland (including the proposed sump area) north of the pumps was always exposed. Record at 650. Furthermore, Hawks was unaware that the manual had been revised in 1981, requiring that the pumps not be operated when gravity drainage was possible. *See* Plaintiff's exhibit 16 at 17. Hawks admitted that he did not change the pumping procedures to conform to the revision. Record at 653. Bay Fitzhugh, a landowner on Little Taylor Bay, asserted that the area immediately north of the pump was used for cropland, not as a sump as called for in the flood control plan. Record at 599. Upon examination of a photograph of the area to the north of the levee, plaintiff's exhibit 11(C)(12), we agree with Mr. Fitzhugh. The absence of a sump area is significant in light of William Henson's testimony. Henson, a civil engineer employed by the Corps' Little Rock Division, testified that excessive operation of the pumps would eliminate or reduce the need for a sump area. Record at 804–06. Therefore, the testimony concerning the sump indicates that the pumps were operated improperly. This conclusion is also supported by the testimony of Burdette Clemons, a local landowner who stated that she observed the operation of the pumps when the White River was low. Record at 95. Additionally, the section 216 report contains a letter from Ed McGill, Jr., stating that it was his observation that the pumps were employed after heavy rains irrespective of the flood stage of the river. *See*

plaintiff's exhibit 1 at E–23. Brien Winkley, an expert on river problems associated with sedimentation, testified that the pumps acted as vacuums, sucking up increased amounts of silt and depositing it in Little Taylor Bay. Record at 234. Indeed, several area residents testified that they had witnessed the pumps discharging turbid water. Thus, the district court's finding with regard to excessive operation of the pumps is not clearly erroneous.

The district court next determined that lack of maintenance on Mill Creek and the diversion ditch was a cause of sedimentation in Taylor Bay. Focusing on only one part of the court's finding, the Districts argue that the evidence did not support the conclusion that erosion in the diversion ditch resulted in sediment being deposited in Taylor Bay. As we read the district court's opinion, the district court determined that Mill Creek was not maintained properly which improper maintenance inhibited gravity drainage through Mill Creek into the White River. Several employees of the Corps testified that they personally observed Mill Creek and that the creek was overgrown with vegetation. This condition impeded the flow in Mill Creek and resulted in increased runoff (and sediment) being deposited in Taylor Bay via the diversion ditch. Accordingly, we believe that the district court was not clearly erroneous on this point.

We also do not find merit in the Districts' assertion that the district court erroneously determined that the sump area directly north of the levee was not properly utilized. In support of their argument, the Districts refer to the testimony of Henson, who explained that a sump must have been present due to the hydrology and topography of the area. However, Henson also testified that overuse of the pumps would eliminate or decrease the size of the sump area. Record at 804–06. As indicated in our previous discussion regarding the

pumps, this apparently occurred. Because use of a sump would have permitted sediment to settle out, record at 764, the district court was not clearly erroneous in deciding that the failure to maintain a sump area contributed to the siltation difficulties in Taylor Bay.

Finally, the trial court found that lateral drainage of the cultivated land below the levee caused a significant amount of silt to be deposited in Taylor Bay. Neither party disagrees with this conclusion, nor can we. Though witness Winkley testified that downstream land was not a major contributor of the sediment, Dr. Clifft, who conducted a sediment load study, and Dennis Jones, a soil conservationist who studied the effects of erosion on the downstream land, testified that the principal source of sediment in Taylor Bay was erosion from and overflows over the land below the levee. Thus, we conclude that the district court's finding regarding the sedimentation from land downstream from the levee was not clearly erroneous.

Accordingly, we agree with the district court that the Districts' negligent operation of the project caused sedimentation in Taylor Bay, constituting a nuisance as defined by Arkansas law.

### C. Order of Abatement

The district court ordered the Districts to take the following action: institute steps to acquire the full and complete use of the sump areas [2] throughout the year for ponding purposes; solicit the Corps' and Arkansas State Game and Fish Commission's assistance in devising means to abate the nuisance and invoking preventive measures to avoid similar problems in the future; institute measures to remove the silt, debris, and sediment accumulated in the Taylor Bay Stream, diversion ditch, and Mill Creek outlet and institute maintenance procedures for the diversion ditch and streams within the project; solicit the assistance of

**2.** Although the order refers to the plural "areas," the district court was apparently referring to the sump area north of the levee. In the section of the district court's opinion addressing the nuisance claim, the court only discussed this sump area. Moreover, the parties' arguments con-

cerning the order of abatement only discussed the sump area near the levee. Therefore, we conclude that the portion of the abatement order referring to "areas" means the sump area directly north of the levee.

the United States Soil Conservation Service in seeking to persuade and induce the landowners downstream from the levee between Little Taylor Bay and the White River to engage in better land management practices to the end that the cultivated lands will not serve as a source for silt and sediment that filters into Taylor Bay; and institute the procedures recommended by the Corps as the means for acquiring maximum and effective results from the pumping facility and solicit the Corps' assistance in an effort to determine whether the procedures should be modified or upgraded. *Taylor Bay Protective Ass'n,* 687 F.Supp. at 1328. The Districts argue that the order is vague and that the district court never weighed the costs and benefits or closely tied the remedy to culpability.

"In shaping equity decrees, the trial court is vested with broad discretionary power * * *. [E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973) (citation omitted) (footnote omitted). "In reviewing the district court's grant of a permanent injunction, * * * appellate review of either a grant or denial of injunctive relief is confined to the familiar determination of whether the trial court abused its discretion." *International Ass'n of Machinists v. Soo Line R.R.,* 850 F.2d 368, 374 (8th Cir.1988) (en banc) (citation omitted), *cert. denied,* —— U.S. ——, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989). With these principles in mind, we examine the order.

■ With respect to acquiring the sump area, maintaining the diversion ditch and streams within the project area above the levee, and following proper pumping procedures, we can see no reason for the Districts to complain. The district court determined that failure to take these actions resulted in sedimentation in Taylor Bay, and we have concluded that this determination is not clearly erroneous. Furthermore, the Districts are ordered to do no more than conform their conduct to the Operation and Maintenance Manual.

■ Regarding the solicitation of the Corps' and the Game and Fish Commission's assistance in devising means to abate the nuisance and invoking preventive measures, we find no abuse of discretion. It is in the best interests of the Districts to seek help in these matters. However, we read "abate the nuisance" and "preventive measures" as referring to acquisition of the sump area, maintenance of the diversion ditch and streams within the project area above the levee, and institution of proper pumping procedures.

■ Turning to the requirement that the Districts solicit the aid of the Soil Conservation Service, we agree that the Districts are not responsible for the erosion on the lands downstream from the levee. However, we see nothing burdensome about requesting the Soil Conservation Service to attempt to persuade the landowners downstream from the levee to engage in better land management practices.

■ We are troubled by the mandate to the Districts to institute measures for removing the debris, silt, and sediment in the Taylor Bay Stream. If it is the district court's intent that the Districts clear Taylor Bay of sediment below the levee, we disagree. The lower court found that one of the causes of the sedimentation in Taylor Bay was the erosion of the land downstream from the levee. Therefore, it would be inequitable to assess the entire cost of cleanup to the Districts who were in no way responsible for the farmland erosion. The more sensible course is to first institute the other measures outlined before undertaking the Taylor Bay cleanup. These measures may remedy the problem, making the action unnecessary. Furthermore, it makes no sense to immediately clear Taylor Bay of sediment because sedimentation problems may recur if the other measures are ineffective or are not taken. If the district court subsequently finds that sediment must be removed from Taylor Bay, it can so order. However, if it does so, it must conduct a hearing and may hold each party accountable for only the amount of harm caused by that party. We also note that, although the order of abatement

may be somewhat ambiguous, the district court retained jurisdiction and it may clarify any alleged uncertainties. Thus, in the main, we conclude that the district court did not abuse its discretion.

### D. Section 216 Report

■ The Flood Control Act of 1970, Pub.L. No. 91–611, § 216, 84 Stat. 1818, 1830, provides as follows:

The Secretary of the Army, acting through the Chief of Engineers, is authorized to review the operation of projects the construction of which has been completed and which were constructed by the Corps, * * * and to report thereon to Congress with recommendations on the advisability of modifying the structures or their operation, and for improving the quality of the environment in the overall public interest.

The district court ruled that because review was given exclusively to Congress, judicial review was precluded under 5 U.S.C. § 701(a)(1) (1982). *Taylor Bay Protective Ass'n v. Administrator, U.S. Environmental Protection Agency,* 687 F.Supp. 1319 (E.D.Ark.1985) (order granting partial summary judgment). The Association argues that the Corps used the report as a vehicle to exonerate itself from blame for the damage suffered in Taylor Bay. The Association maintains that judicial review is appropriate here because 5 U.S.C. § 701(a) is inapplicable. Additionally, the Association argues that the report is analogous to an environmental impact statement which is reviewable.

Generally, the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, permits judicial review of agency action. However, judicial review of agency action is impermissible when statutes preclude judicial review, section 701(a)(1), or when agency action is committed to agency discretion by law, section 701(a)(2). In *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court explained the distinction between subsections (a)(1) and (a)(2). Subsection (a)(1) precludes judicial review in those situations where Congress expresses an in-

tent to prohibit judicial review. *Id.* at 410, 91 S.Ct. at 820. Subsection (a)(2) proscribes review "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.* (quoting S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). Although judicial review may be foreclosed in this case by subsection (a)(2), we think subsection (a)(1) is more applicable. "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Institute,* 467 U.S. 340, 345, 104 S.Ct. 2450, 2453, 81 L.Ed.2d 270 (1984) (citations omitted).

Section 216 requires that the Corps "report [on the operation of projects] to Congress with recommendations on the advisability of modifying the structures or their operation." Under the statute's terms, the Corps serves an advisory role to Congress. Congress uses the information provided by the Corps to determine whether legislation is needed. Thus, it is Congress' role to determine the adequacy of the study and report, not the courts. If the Association takes issue with the conclusions stated in the report, it may bring its contentions to the attention of Congress. As a policy matter, if Congress is contemplating or does enact legislation, we can well imagine the chaos which will result if the courts interfere with injunctive or other relief. Indeed, here Congress has received the report and directed the Corps to conduct an ongoing study on water quality. Record at 1219–20.

We have examined the statutory scheme under which section 216 was enacted and can see nothing in the scheme indicating that judicial review of a section 216 report is necessary or advisable. Furthermore, we have not located any legislative history concerning the Act, nor has any been cited to us. Additionally, the nature of the agency action here is distinct from the type of agency action normally reviewable. We

agree with the District of Colombia Circuit that courts are ill-equipped to review the results of these reporting statutes. *See Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 316–19 (D.C.Cir. 1988).

The Association analogizes the section 216 report to an environmental impact statement which is prescribed in 42 U.S.C. § 4332 (1982) and which is subject to judicial review. Unlike section 4332, section 216 provides no procedures or standards by which a court could judge an agency's actions. *See Natural Resources Defense Council*, 865 F.2d at 317. Thus, we conclude that under section 701(a)(1), the report is not judicially reviewable.

### III. CONCLUSION

We need not reach the statute of limitations issue regarding the sump areas. The district court's order requiring the Districts to acquire the sump areas, which order we have upheld, makes this issue moot. We have carefully examined the Districts' other contention with respect to consultation with the Fish and Wildlife Service and find it to be without merit. For the foregoing reasons, we affirm the decision of the district court.