INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, DISTRICT LODGE NO. 19, an unincorporated labor organization, Appellee,

v.

SOO LINE RAILROAD COMPANY, a Minnesota corporation, Appellant.

No. 86–5355.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1988.

Decided June 22, 1988.

I. Michael Greenberger, Washington, D.C., for appellant.

Roger A. Jensen, St. Paul, Minn., for appellee.

Before LAY, Chief Judge, HEANEY, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL and BEAM, Circuit Judges, en banc.

MAGILL, Circuit Judge.

In this case we examine whether an employee has the right to seek out his employer and voluntarily quit his job on terms agreeable to both him and his employer, or whether that basic right must be bargained for on his behalf by his union. The Soo Line Railroad Company (Soo Line) appeals from a decision of the United States District Court for the District of Minnesota, permanently enjoining the Soo Line from entering into voluntary separation agreements with individual members of the International Association of Machinists and Aerospace Workers, District Lodge No. 19 (IAM or Union).

The Soo Line contends on appeal that the district court did not have subject matter jurisdiction over the disagreement between the Soo Line and IAM because (1) the disagreement between them is not a dispute, as that term is used in the Railway Labor Act, 45 U.S.C. §§ 151–188 (RLA); (2) even if the disagreement is a dispute within the ambit of the RLA, it is a minor dispute subject to resolution by the National Railroad Adjustment Board; and (3) the pertinent agreements between the Soo Line and IAM require arbitration of any dispute arising out of their interpretation or application, and this is such a dispute.

We discuss these sequentially. Section 2 of the Railway Labor Act, 45 U.S.C. § 151a, sets out the disputes to which it applies as "all disputes concerning rates of pay, rules, or working conditions" and "all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." As we explain more fully in Section II(B), numerous courts have assumed the presence of a labor dispute in situations similar to the one at issue.[1] We therefore base our decision on the Soo Line's second and third arguments. Accordingly, we conclude that the district court erroneously asserted equitable jurisdiction in this case, and we reverse and remand for arbitration.[2]

## I. BACKGROUND.

This case has its genesis on February 19, 1985, when the Soo Line acquired the core rail assets of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company (Milwaukee) from its trustee in bankruptcy. Two statutory regimes governed the Soo Line's acquisition of Milwaukee (Acquisition): the Milwaukee Railroad Restructuring Act, 45 U.S.C. §§ 901–922 (the Restructuring Act), and the Interstate Commerce Act, 49 U.S.C. § 10101 et seq. (ICA).

### A. The Restructuring Act.

The Restructuring Act was passed as an emergency measure to restructure the financially ailing Milwaukee, in order to avoid the potential unemployment and economic damage that would result if the Milwaukee were to cease operating. 45 U.S.C. § 901(b). The Restructuring Act primarily sets out procedures through which courts, the Secretary of Transportation, and the Interstate Commerce Commission (ICC) may supervise transactions pertaining to the Milwaukee, such as sales, transfers,

---

1. Moreover, as we will explain in greater detail, a pertinent agreement in this case contains arbitration clauses. As this court has stated:

 [W]hen disagreement arises between the parties whether a particular dispute is arbitrable under the terms of the governing labor agreement, courts will broadly construe the agreement in favor of arbitrability, resolving doubts on the side of the board's authority. *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960); *Zeviar v. Local 2747, [Airline, Aerospace and Allied Employees,* 733 F.2d 556, 559 (8th Cir.

 1984) ]; *Lackawanna Leather v. United Food & Commercial Workers,* 706 F.2d 228, 230–31 (8th Cir.1983) (en banc).
 *Ozark Air Lines, Inc. v. Air Line Pilots Association, Int'l,* 744 F.2d 1347, 1350 (8th Cir.1984), *aff'd en banc by an equally divided court,* 761 F.2d 1259, *cert. denied,* 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 231 (1985).

2. The panel opinion previously filed, 833 F.2d 730 (8th Cir.1987), was withdrawn and vacated when the petition for rehearing *en banc* was granted.

abandonments, and conversion plans. 45 U.S.C. §§ 903–905, 915. The Restructuring Act also sets out a variety of protective measures for Milwaukee employees, 45 U.S.C. §§ 907–914.

The Restructuring Act required the Soo Line, as a condition of the Acquisition of Milwaukee, to provide protections for potentially affected employees. Section 904(b)(1) of the Restructuring Act set out the level of protection required, and authorized the federal district court supervising the Acquisition (reorganization court) to decide for itself what specific labor protective conditions should be imposed. Section 904(b)(1) provides: "In authorizing any such sale or transfer, the court shall provide a fair arrangement at least as protective of the interest of employees as that required under section 11347 of title 49 of the United States Code." (Section 11347 of the ICA.)³ This mandate brings us to the second of the two statutes governing the transaction, the ICA.

B. The ICA Protective Agreement.

As this court recently stated in *Burlington Northern Railroad Co. v. United Transportation Union*, 848 F.2d 856, 859–60 (1988), the goal of the ICA is to make commerce flow smoothly, to the benefit of both American industry and consumers. The ICA seeks to ensure fair shipping rates, safety and efficiency in transportation, and to preserve the viability of various modes of transportation. *See* 49 U.S.C. §§ 10101, 10101a.

■ The ICA generally requires that before a railroad acquires an additional line, the rail carriers involved in the transaction must obtain the approval of the ICC. 49

U.S.C. § 10901. In furtherance of the ICA's goal of preventing labor strife by "encourag[ing] fair wages and safe and suitable working conditions in the railroad industry," 49 U.S.C. § 10101a(12), the ICC, before approving a particular transaction, has generally required the imposition of plans to compensate workers displaced by the transaction. *See* 49 U.S.C. § 11347. These plans are called labor protective provisions or agreements. Under the authority granted by the ICA, the ICC has developed standard labor protective provisions for particular types of transactions. When the transaction involves the sale of a rail line, such as here, the ICC imposes the *New York Dock* conditions upon the parties. *See New York Dock Railway—Control—Brooklyn E.D. Terminal*, 360 I.C.C. 60 (1979), *aff'd*, 609 F.2d 83 (2d Cir.1979).

The *New York Dock* conditions provide essentially that any employee furloughed as a result of a merger or similar transaction must be paid, generally for six years, the equivalent of the wage earned at the time of the adverse action, unless he or she chooses instead to take a one-time payment of up to one year's pay (valued at approximately $38,000 per employee in this case); that issues pertaining to seniority and contract rights between the employees of the two merged railroads must be resolved by an implementing agreement with the consolidated railroad's unions; that existing collective bargaining agreements must be preserved; and that mandatory and binding arbitration be used to resolve "any dispute or controversy with respect to the interpretation, application or enforcement of any provision" of the *New York Dock* conditions.⁴

---

3. Section 11347 requires the carrier to provide a fair arrangement at least as protective of the interests of employees as the terms imposed under section 11347 prior to February 5, 1976 (the date the section was amended) as well as those established under section 405 of the Rail Passenger Service Act, 45 U.S.C. § 565.

4. Section 11 of the *New York Dock* conditions contains a mandatory arbitration clause which provides, in pertinent part:
 11. *Arbitration of disputes.*—(a) In the event the railroad and its employees or their

authorized representatives cannot settle any dispute or controversy with respect to the interpretation, application or enforcement of any provision of this appendix, * * * it may be referred by either party to an arbitration committee.
 This court has recently held that arbitration clauses identical to those at issue here mandate compulsory arbitration of "any dispute" between the parties relating to *New York Dock* protections. *Hoffman v. Missouri Pacific Railroad*, 806 F.2d 800, 801 (8th Cir.1986). Even

The Soo Line informed both the ICC and the reorganization court that several hundred employees would lose their jobs as a result of the Acquisition. *See Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Co.,* 799 F.2d 317, 328–29 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 2460, 95 L.Ed.2d 869 (1987). The ICC recommended that the *New York Dock* conditions be imposed upon the Acquisition, and the reorganization court, except for making minor changes,[5] applied the *New York Dock* conditions.

Accordingly, on September 10, 1985, the Soo Line entered into an employee protective agreement (Protective Agreement) with Milwaukee and IAM. The Protective Agreement, which incorporated the *New York Dock* conditions in conformity with the reorganization court's order, was meant to provide standard labor protective provisions pursuant to section 11347 of the ICA and the Restructuring Act. As described in its preamble, the purpose of the Protective Agreement was:

> to provide * * * for fair and equitable arrangements to protect the interests of Employees adversely affected by the Acquisition; and to provide for expedited changes in services, facilities, operations, seniority and existing collective bargaining agreements to enable the expanded railroad system created by the Acquisition to be operated in the most efficient manner, as one completely integrated railroad.

## C. The RLA Collective Bargaining Agreement.

Before the execution of the Protective Agreement, as a result of negotiations en-

tirely unrelated to the Acquisition, the Soo Line and IAM entered into a collective bargaining agreement (CBA) on March 1, 1985. The CBA was negotiated in accordance with the provisions of the RLA, which seeks among its aims to secure the "complete independence" of railroads and their employees in matters of self-organization to carry out the purposes of the RLA. *See* 45 U.S.C. § 151a. The CBA set out rules concerning working hours and conditions, layoffs, promotions, seniority, grievances and employee discipline. The CBA made no explicit mention of an employee's right of voluntary resignation.

## D. The Voluntary Separation Plan.

Post–Acquisition, in December 1985, the Soo Line decided to reduce the number of employees on its payroll. It offered voluntary separation pay plans to certain employees represented by unions other than IAM. Under these plans, employees who voluntarily resigned would receive $15,000 cash in a lump-sum severance payment and, if they were age sixty or older, would have their health benefits continued until they were sixty-five. To take advantage of the plan, each employee was required to:

> Release all rights under labor protective conditions, including but not limited to, statutory, contract, or agreement labor protection and those conditions commonly referred to as Appendix B. * * * [R]esign and relinquish all rights of or claims to employment with the Soo Line Railroad * * * and release and discharge said railroad company, * * * from any and all claims of whatsoever kind and

---

though these arbitration clauses say disputes "may" be referred to arbitration, the clauses nevertheless make the arbitration both mandatory and binding. *Hoffman,* 806 F.2d at 801.

5. As explained by the court in *Matter of Chicago,* 799 F.2d at 329:

> The principal difference between the "Appendix B" conditions [those conditions actually imposed in this case] and the *New York Dock* conditions is that although *New York Dock* requires the railroad to notify employees of impending changes 90 days in advance, and to negotiate with the unions concerning their consequences until agreement is reached, "Ap-

pendix B" shortens the time to ten days and allows the railroad to make the changes whether or not the unions consent. "Appendix B" also requires that any employee injured by this accelerated schedule be made whole. *See In re Chicago, Milwaukee, St. Paul & Pacific R.R.,* 658 F.2d 1149, 1151–52 (7th Cir.1981) (*Protective Conditions* ), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982), for a description of the difference.

For purposes of clarity in this opinion, the conditions imposed will be referred to as the *New York Dock* conditions.

nature growing out of or in connection with said employment.

Soo Line Railroad Voluntary Separation Pay Plan at p. 3.

Many employees accepted the separation plan and terminated their services with the Soo Line. For example, on December 11, 1985, the Soo Line offered a voluntary separation pay plan to certain employees represented by the United Transportation Union (UTU). There were no negotiations with the UTU, and eighty-one UTU employees voluntarily participated in the plan. Likewise, on January 31, 1986, the Soo Line offered to employees classified as "enginemen" represented by the UTU and the Brotherhood of Locomotive Engineers (BLE) a similar voluntary separation plan. Again, there were no negotiations with either of these unions and fifty-six BLE and UTU enginemen accepted the plan and terminated their services with the Soo Line.

In addition, numerous other Soo Line employees from ten different "old-line" labor unions (other than UTU and BLE) voluntarily requested and were granted separation pay plans. The Soo Line did not negotiate with either the employees or their unions regarding the plans. Neither the UTU, the BLE, nor any of the ten other unions even sought to negotiate with the Soo Line as to these voluntary plans, and at no time did these unions protest that offering the plans constituted a major dispute under the RLA. In all, nearly 400 union-represented employees accepted voluntary separation plans.

IAM learned of the program and questioned the Soo Line with respect to the applicability of the program to machinists. The Soo Line said it was not making such a plan available to the machinists. Thereafter, eight machinists, all over sixty years of age and with top seniority, contacted the Soo Line asking to participate in a similar

plan. Of the eight, those who met certain additional qualifications, *see* 45 U.S.C. § 231a(a), were also eligible for retirement annuities under the Railroad Retirement Act of 1974, 45 U.S.C. § 231 *et seq.* The eight machinists' requests were honored and, after signing the necessary releases, their services with the Soo Line were terminated. Each received a separation allowance of $15,000 and became eligible to continue to receive certain health benefits until age sixty-five.

### E. The District Court Injunction.

When IAM learned that the separation plan was being offered to some of its members, it objected. In response to this objection, the Soo Line agreed to meet with IAM voluntarily and informally, in an effort to alleviate its concerns.[6] These discussions were unsuccessful. The Soo Line thereafter announced its intention to solicit other machinists' resignations pursuant to a voluntary separation plan (the Individual Plan), containing essentially the same terms as the agreements signed by other Soo Line employees. IAM then filed this action seeking to restrain the Soo Line from entering into the Individual Plan with individual machinists. IAM argued that the Individual Plan contravened the *New York Dock* conditions because its effect was to relieve the Soo Line of its obligations under those conditions. IAM contended that the eight senior machinists who voluntarily resigned would reduce by eight the number of employees who would have been furloughed as a result of the merger and thus would have been entitled to benefits under the *New York Dock* conditions. IAM claimed in effect that the early retirement program was an attempt to substitute a uniform lump-sum payment of $15,000 for payment for six years of service (or alternatively, $38,000) under the Protective Agreement.

**6.** IAM asserts that these discussions were tantamount to formal negotiations, and by proceeding in formal negotiations, the Soo Line acknowledged that this was a subject of mandatory bargaining. In our view this misinterprets the record. In an affidavit, the Senior Vice President for Labor Relations and Personnel for the Soo Line stated that the discussions only occurred with the understanding that they were without prejudice to the Soo Line's rights to unilaterally accept separation requests from machinists. Moreover, we know of no rule that requires the transformation of an issue into a major dispute under the RLA merely because discussions take place that could be characterized as "negotiations."

The matter was submitted to the district court on affidavits, exhibits, and abbreviated oral testimony. The parties stipulated that the hearing on the preliminary injunction could be considered the hearing for a permanent injunction. The district court first looked to section 6 of the RLA and reasoned that it:

> establishes a comprehensive series of bargaining procedures, complete with detailed timetables and provisions for notice, to be followed by employers and bargaining representatives in effecting changes in rates of pay, rules, and working conditions. 45 U.S.C. 156. When employers wish to make changes in any regulated areas, the statute mandates written notice of the desired modification, after which conferences between management and labor take place, with the optional assistance of the National Mediation Board.

District Court Order at 3–4.

The district court then reviewed the cases which have defined the concededly hazy continuum between major and minor disputes and found that the dispute between the parties was major. It stated:

> [T]he Court is not called upon to review the status of either labor or management at the interstices of an agreement. Instead, the case presents fundamental issues of whether or not a person may even be an employee or a member of a union. We are not defining an inter-employment relationship, but the fundamental nature of the employment relationship itself.
>
> Both parties agree that there is no provision in the existing agreements between the Union and Soo Line allowing solicitation of individual union members or for individual lump-sum separation agreements. Under the *Elgin* definition and the decisions of the other courts which have faced the jurisdictional issue in the present context, this dispute is major, and this Court therefore has jurisdiction over it.

*Id.* at 6.

The court went on to hold that individual agreements such as the Individual Plan proposed by the Soo Line were impermissible, and enjoined the Soo Line from entering into the Individual Plan with employees represented by the Union until such time as the Soo Line complied with the notice, bargaining and mediation procedures of section 6 of the RLA, which have been called "almost interminable." *See Brotherhood of Maintenance of Way Employees v. Chicago and North Western Transportation Co.*, 827 F.2d 330, 333 (8th Cir.1987).

## II. DISCUSSION.

 In reviewing the district court's grant of a permanent injunction in this case, we note that appellate review of either a grant or denial of injunctive relief is confined to the familiar determination of whether the trial court abused its discretion. *See Olin Water Services v. Midland Research Laboratories, Inc.*, 774 F.2d 303, 307 (8th Cir.1985). Abuse of discretion occurs if the district court rests its conclusion on clearly erroneous factual findings or if its decision relies on erroneous legal conclusions. *Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.*, 838 F.2d 1102, 1104 (9th Cir.1988). Whether a matter is a dispute under the RLA, and if so, whether it is a major dispute or a minor dispute, are both questions of law which we review *de novo*. *See Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.*, 838 F.2d 1087, 1089 (9th Cir.1988).

We are also well aware that our inquiry as to the probity of an injunction is limited to those issues directly related to the injunction, for "[a]n injunction does not settle a dispute—it simply disables one of the parties," *Burlington Northern Railroad Co. v. Brotherhood of Maintenance of Way Employes*, —— U.S. ——, 107 S.Ct. 1841, 1854, 95 L.Ed.2d 381 (1987). With these parameters in mind, we proceed to examine the three issues in this case.

### A. Existence of a Dispute.

We first examine the district court's conclusion that the disagreement at issue in this case is a dispute under the RLA. Section 2 of the RLA, 45 U.S.C. § 151a, pro-

vides that one of the purposes of the RLA is "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions."

■ The Soo Line argues that no "dispute," as that term is contemplated by the RLA, exists here; rather, the Soo Line characterizes the situation as one involving a matter of voluntary choice, personal to each employee. The Soo Line maintains that this case does not concern "rates of pay, rules, or working conditions," nor is an employee's right to resign derived from, dependent upon, or governed by a collective bargaining agreement. Simply put, the Soo Line argues that the RLA does not govern an employee's right to voluntarily separate from employment under terms advantageous to him. The district court concluded, however, that the Soo Line's offer of the Individual Plan to employees violated the RLA.[7] We disagree. Our examination reveals that the statutory language and case law allow the Soo Line to offer employees the Individual Plan in full compliance with the RLA.

As a starting point, the RLA itself appears to recognize an employee's right to terminate his employment relationship on terms he finds acceptable:

> Nothing in this chapter shall be construed to require an individual employee to render labor or service without his consent, nor shall anything in this chapter be construed to make the quitting of his labor or service by an individual employee an illegal act; nor shall any court issue any process to compel the performance by an individual employee of such labor or service, without his consent.

45 U.S.C. § 159 Eighth.

The Supreme Court has also spoken on this issue. The Court has stated, simply, that certain individual employment contracts may exist side-by-side with a collective bargaining agreement. *See J.I. Case*

*Co. v. National Labor Relations Board,* 321 U.S. 332, 339, 64 S.Ct. 576, 581, 88 L.Ed. 762 (1944); *Order of Railroad Telegraphers v. Railway Express Agency, Inc.,* 321 U.S. 342, 347, 64 S.Ct. 582, 585, 88 L.Ed. 788 (1944); *Caterpillar Inc. v. Williams,* —— U.S. ——, 107 S.Ct. 2425, 2431–32, 96 L.Ed.2d 318 (1987). The principles set out in *J.I. Case* and its progeny are equally applicable to employees covered by the RLA and the National Labor Relations Act. *Order of Railroad Telegraphers,* 321 U.S. at 347, 64 S.Ct. at 585.

At least one circuit court, the National Mediation Board, and the National Railroad Adjustment Board have condoned voluntary quits. *See Antonioli v. Lehigh Coal and Navigation Co.,* 451 F.2d 1171, 1175 (3d Cir.1971), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1608, 31 L.Ed.2d 816 (1972); *Brotherhood of Railway Carmen of the United States and Canada v. Illinois Gulf Central Railroad,* National Mediation Board Case No. 6, Public Law Board No. 2603 (1980); *System Federation No. 69, Railway Employes' Dep't v. Florida East Coast Railway Co.,* National Railroad Adjustment Board Award No. 4733 (2d Div. 1965), slip op. at 30; *System Federation No. 2, Railway Employes' Dep't v. Missouri Pacific Railroad Co.,* National Railroad Adjustment Board Award No. 1579 (2d Div.1952), slip op. at 4.

In sum, there is strong support for the Soo Line's position that no dispute under the RLA exists here. We are mindful, however, of the substantial case law, *see infra,* that has found the existence of a dispute under similar circumstances. We are also aware of the strong presumption of arbitrability in these types of cases, *see supra Ozark Air Lines,* 744 F.2d at 1350. Thus, we assume without deciding that the district court was correct in its conclusion that this case implicates a "dispute" under the RLA.

---

**7.** The district court's analysis of this issue is as follows:

> If these company/individual agreements were to be allowed, the union would be denied the right of access to formal negotiation concerning compensation for severance; a right se-

cured to it by Section 6. Further, these events occur in a setting in which an existing furlough plan is in place. Under these conditions, the Court finds that Soo Line's conduct violates the RLA and its underlying policies. District Court Order at 8.

## B. Major–Minor Dispute.

█ Proceeding on the assumption that this case does indeed present a dispute, we think the conclusion is inescapable that the dispute is minor.

The Supreme Court set out the difference between major and minor disputes under the RLA in *Elgin, Joliet & Eastern Railway Co. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945):

> [I]t is clear from the [Railway Labor] Act itself, from the history of railway labor disputes and from the legislative history of the various statutes which have dealt with them, that Congress has drawn major lines of difference between the two classes of controversy.
>
> The first ["major" disputes] relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.
>
> *The second ["minor" dispute] class, however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one.* The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.

*Elgin*, 325 U.S. at 722–23, 65 S.Ct. at 1289. (Footnotes omitted; emphasis added.) The Supreme Court went on to explain that major disputes involve "large issues about which strikes ordinarily arise" while minor disputes affect smaller differences which "arise incidentally in the course of an employment" and are "of a detailed or individual quality." *Id.* at 723–24, 65 S.Ct. at 1290.

Section 3 of the RLA commits minor disputes over the "interpretation or application" of existing agreements and practices to the exclusive jurisdiction of Adjustment Boards, i.e., to "compulsory arbitration." 45 U.S.C. § 153 First (i); *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.*, 353 U.S. 30, 39, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957); *see Elgin*, 325 U.S. at 724, 65 S.Ct. at 1290. While the controversy is pending before the Board, the carrier may apply its reasonable interpretation of the disputed agreement, with limited exceptions not here relevant. *Brotherhood of Maintenance of Way Employees v. Burlington Northern Railroad Co.*, 802 F.2d 1016, 1022 (8th Cir.1986).

█ In deciding whether a dispute is major or minor, it is not our function to interpret or construe the language of the collectively bargained-for agreements between the parties (the CBA and Protective Agreement); rather, our function is to determine whether this case implicates a question of contract interpretation. *International Association of Machinists v. Northwest Airlines, Inc.*, 843 F.2d 1119, 1122 (1988). If the parties disagree whether the dispute can be resolved by reference to an agreement, the dispute is minor unless the claims of contractual justification are "frivolous" or "obviously insubstantial." *Maine Central Railroad Co. v. United Transportation Union*, 787 F.2d 780, 783 (1st Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986); *Chicago and Northwestern Transportation Co. v. United Transportation Union*, 656 F.2d 274, 278–79 (7th Cir.1981). This circuit has framed the test as follows:

> This Court has said that a dispute is minor if the agreement is "reasonably susceptible" of the interpretations sought by both the employer and the employees. Other courts have said that a dispute is minor if the employer's action can be arguably justified under the terms of the existing agreement, or that the dispute is minor unless the employer's argument that its actions are within the contract is "obviously insubstantial." These locutions are essentially the same in their result. They illustrate the relatively light burden which the [Soo Line] must bear in showing that its actions are at most minor changes and thus within the status quo.

*Brotherhood of Maintenance of Way Employees v. Burlington Northern Railroad Co.*, 802 F.2d 1016, 1022 (8th Cir.1986) (citations omitted); *see also United Transportation Union v. Burlington Northern, Inc.*, 458 F.2d 354, 357 (8th Cir.1972). This rule is a necessary adjunct of the need to protect the arbitrator's exclusive jurisdiction over minor disputes and supports the additional corollary that "when in doubt, the courts construe disputes as minor." *Brotherhood of Locomotive Engineers v. Atchison, Topeka and Santa Fe Railway Co.*, 768 F.2d 914, 920 (7th Cir.1985).[8] Thus, in this case, if the bargained-for agreements arguably permit the practice, then the Soo Line may proceed unilaterally, subject to arbitration before the National Railroad Adjustment Board. *Brotherhood of Maintenance of Way*, 802 F.2d at 1021–22.

IAM contends that the disagreement over the Individual Plan is a major dispute.

While both parties agree that the CBA does not authorize or prohibit this type of "voluntary quit" plan, IAM argues that the terms of the Individual Plan are in direct conflict with the Protective Agreement. The Soo Line, on the other hand, contends that the Protective Agreement and the Individual Plan may coexist because the Individual Plan is entirely voluntary, results only in an employee's resignation, and does not unilaterally change the rules, working conditions or rates of pay for employees that choose to remain employed with the Soo Line.[9] According to the Soo Line, an employee has the right to terminate his employment at will on any terms he or she can obtain from the employer. The Soo Line also argues that the Individual Plan furthers this right and does not violate or undermine the CBA; therefore, it is a retained "management prerogative," and thus does not constitute direct dealing with employees in violation of the RLA.[10]

---

8. We note by analogy that "[a]s a general rule, federal courts do not have jurisdiction over activity [that] is 'arguably subject to § 7 or § 8 of the [NLRA],' and they 'must defer to the exclusive competence of the National Labor Relations Board.'" *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83, 102 S.Ct. 851, 859, 70 L.Ed.2d 833 (1982) (quoting *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959)). Section 7 of the NLRA, 29 U.S.C. § 157, generally provides that employees have the right to join, or refrain from joining, unions. Section 8 of the NLRA, 29 U.S.C. § 158, generally defines unfair labor practices by both employers and unions.

9. Both dissents assert that implementation of the Individual Plan will result in employee and work transfers, will affect seniority and bidding rights of other IAM members, and will probably deprive some employees of the opportunity to be separated under the terms of the Protective Agreement. We can find no support in the record for these predictions. In fact, in an affidavit, the General Chairman of IAM stated that any current or future furloughs, transfers, and work reductions resulted from the Acquisition, not the Individual Plan. Accordingly, under the broad definitions of "affected" or "displaced" employees in the Protective Agreement and *New York Dock* conditions, any employees furloughed or transferred would become eligible for benefits under the Protective Agreement and would in no way be harmed by the Individual Plan. As to seniority rights, any effect that the Individual Plan has will be positive, not

negative, for if employees opt for the Individual Plan, the seniority of remaining Union members will be increased. Moreover, the presence of the Individual Plan will not deprive any employees of the opportunity to be separated under the terms of the Protective Agreement, for the simple reason that an employee who opts for the Individual Plan is not being deprived, but is making a free choice. An employee who decides against the Individual Plan remains as eligible as ever for the benefits of the Protective Agreement.

10. Judge Heaney argues in dissent that by negotiating the Individual Plan, the Soo Line reduced its obligations under the Protective Agreement, while benefitting select IAM members to the detriment of those members who would have otherwise qualified for benefits under the Protective Agreement. The dissent apparently finds fault with the Soo Line for trying to avoid the prospect of paying people to sit at home. In our view this argument downplays a key consideration, namely that the Individual Plan is completely voluntary. An employee who decides not to seek the Individual Plan remains as eligible as ever for benefits under the Protective Agreement, if affected by the Acquisition. Had the eight employees at issue been eligible for the greater benefits offered by the Protective Agreement, they would have opted for the Protective Agreement, entailing as it did benefits more than double those of the Individual Plan. These near-retirement employees had such vested seniority rights that it is dubious whether they

378

As we have noted, the touchstone of a major-minor dispute is whether a party's position is frivolous or clearly insubstantial. A number of tribunals have held that the very argument that the Soo Line sets forth here presents a minor dispute.

In *Chambers v. Burlington Northern, Inc.*, 692 F.2d 109 (10th Cir.1982), the court examined a dispute arising out of an employee transfer. The defendant, Burlington Northern (BN), formed in a merger of several railways in 1970, was required by the ICC to enter into a protective agreement, and accordingly executed a "Merger Protection Agreement" (MPA). The MPA and the merger were approved by the ICC.

Plaintiff Chambers was an engineer-fireman who was transferred. He executed a written agreement with BN in which he voluntarily relinquished his seniority in exchange for a lump-sum payment. *Chambers*, 692 F.2d at 110. When Chambers entered the agreement with BN he was subject to two collective bargaining agreements (CBAs), neither of which had provisions applicable to seniority or allowances on transfer.

Ten months after Chambers had signed his lump-sum agreement with BN, however, BN and the unions made new CBAs which gave a transferred employee both more money on transfer and provided that the transferred employee would retain his prior seniority. Chambers sued, arguing that BN had violated the MPA because his agreement with BN provided him less protection than was contained in the later CBA.

The court stated:

[T]he question of forestalling and changing of obligations requires consideration,

interpretation, and application of the MPA, the Union agreement in effect when the individual agreement was made, and the bargaining agreement made ten months after the individual agreement.

*Chambers*, 692 F.2d at 111. The court went on to hold that the dispute was minor and must be submitted to the exclusive jurisdiction of the National Railroad Adjustment Board, because "[i]n the final analysis, the dispute here relates to the interpretation and application of the MPA and the bargaining agreements." *Id.* at 112.

In *Clausen v. Burlington Northern, Inc.*, 106 LRRM 2496 (D.Mont.1980) [available on WESTLAW, 1980 WL 2113], the district court faced an issue similar to that in this case. Clausen was employed by BN as a fireman-engineer. The ICC required the implementation of a merger protective agreement (MPA), when BN was formed. The MPA provided protection for employees transferred by BN, but contained no provision for seniority adjustments on transfer.

Clausen and BN agreed that Clausen would accept a transfer. The agreement provided that Clausen would relinquish his prior seniority and reestablish it in the new location. Thereafter, BN and the Brotherhood of Locomotive Engineers negotiated a new collective bargaining agreement, which contained provisions covering benefits for transferred employees. The benefits in the new agreement exceeded those Clausen had received. Clausen filed suit, alleging that the individual agreement he negotiated with BN violated the RLA and the MPA, which incorporated the new col-

would have been "affected" by the Acquisition. Thus the existence of the Individual Plan did not detract from rights that they otherwise had under the Protective Agreement, but rather, gave them rights which they otherwise could not have claimed under the Protective Agreement.

When one looks at the practicalities of the railroad seniority system, an ancillary reason for the Union's complaint becomes apparent. As a result of the Acquisition, the Protective Agreement required that those machinists with less seniority were furloughed first and were

being paid a day's wages for not working; however, when the senior eight machinists quit and took the $15,000, the seniority of the junior machinists was increased by eight and some or all of them may have gone off furlough and back in service. The Union's efforts, which would result in the Soo Line's paying junior machinists to remain on furlough, hardly comports with the preamble in the Protective Agreement signed by the Soo Line and the Union to "provide for expedited changes" to allow operation of the Soo Line "in the most efficient manner."

lective bargaining agreement. The court held that the dispute was minor, stating at 106 LRRM 2499–2500:

> The fundamental conflict here is whether relevant sections of a Merger Protection Agreement apply to and permit the execution of individual contracts regarding seniority transfers. The plaintiff is attempting to avail himself of certain compensation provisions of the May 23, 1975, agreement between B.N. and UTU–E. Plaintiff also seeks restoration of his original seniority status and the difference between lump sum payments under his individual contract and the subsequent B.N.–UTU–E agreement. The plaintiff contends that § 6 of the MPA is violated by the individual contract negotiated with the defendant. * * * Therefore, plaintiff maintains that a collective agreement encompasses the issue in dispute and defendant contends that such agreement does not contemplate the specific controversy involved herein. Thus, the validity of the individual agreement negotiated by the parties necessarily requires interpretation and application of relevant provisions within the Merger Protection Agreement in effect at the time of the letter agreement negotiation. Interpretation and application of collective bargaining agreements within this context have consistently been deferred to the specialized expertise of the National Railway [sic] Adjustment Board.

In *International Association of Machinists and Aerospace Workers v. Illinois Central Gulf Railroad Co.*, 102 Lab. Cas. ¶ 11,345 (S.D.Ill.1984) [available on WESTLAW, 1984 WL 1451], the district court examined a factual dispute similar to the one presented here. Illinois Central made individual agreements with furloughed employees for lump-sum payments in exchange for the individual employee's resignation, allegedly in violation of both a collective bargaining agreement and merger protective agreement. Illinois Central argued that the merger protective agreement, combined with past practices in which the unions acquiesced, gave Illinois Central the right to make the individual agreements. The union argued that no such past practices existed, and that any individual severance agreements were in derogation of the collective bargaining agreement.

After examining the record, the court held that Illinois Central's argument that there was a past practice of making individual severance agreements was not frivolous, nor was the union's argument that there was no such past practice.[11] In view of the fact that "a dispute over the interpretation of rights under implied agreements based on past practices is a minor dispute, as long as both parties advance on interpretation that is not frivolous," *Railway Express Agency v. Brotherhood of Railway, Airline and Steamship Clerks*, 437 F.2d 388 (5th Cir.), *cert. denied*, 403 U.S. 919, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1971), the court held the dispute to be minor and subject to mandatory arbitration. More importantly for our purposes, the court went on to state:

> Even if there were no past practice of making individual agreements, this matter should still be one subject to arbitration under the Merger Agreement which imposes protective conditions upon [Illinois Central]. The Merger Agreement has an arbitration clause and therefore any interpretation of the agreement is within the jurisdiction of the adjustment board. *See Illinois Central Railroad v. Wood*, Civil No. 69–107 (E.D.Ill.1970). The severance agreements were made

---

**11.** In this case, neither side makes any argument regarding past practice, or a lack thereof, with regard to the offering of lump-sum separation plans. Accordingly, past practices play no part in our decision. We note, however, that when employees of the Soo Line are injured they have the right to make claim and commence suit under the provisions of the Federal Employer's Liability Act (FELA). Soo Line has been negotiating settlement agreements with injured employees for over fifty years pursuant to the FELA, whereby an injured employee negotiates directly with the railroad to terminate his employment for consideration. These settlements have always been between the Soo Line's Claim Department or the Soo Line's Law Department and the employee (with or without an attorney), without any involvement by the labor organizations.

with protected employees, arguably in compliance with the Merger Agreement. Thus the court, completely apart from the past practices argument, based its decision on the fact that the merger agreement had to be interpreted to resolve the dispute, because Illinois Central's actions arguably were in compliance with the Merger Agreement.

The major-minor dispute issue was most recently addressed in *Transportation–Communication Employees Union v. Grand Trunk Western Railroad Co.*, 679 F.Supp. 696 (E.D.Mich.1988). The union contended that management had violated the RLA and various bargained-for agreements, by engaging in direct negotiation with individual employees on the issue of separation agreements without consulting the union. The union sought an injunction prohibiting management from offering the individual separation plans. The court declined to assume jurisdiction, finding the dispute to be minor because "the individual separation agreements arguably are consistent with, and authorized by, the express terms of the * * * Protective Agreement." At 699. The court also found not frivolous management's assertion that the union had agreed, through past practice, to the offering of the individual plans. Here as well the Individual Plan arguably is "consistent with, and authorized by," the Protective Agreement.

■ These cases stand for the proposition that the Soo Line's assertion (i.e., that the Individual Plan does not violate the CBA and Protective Agreement) is not frivolous. This is so for the simple reason that the overwhelming majority of courts to consider the identical or highly similar argument have reached one of two conclusions: either that the Soo Line's position is correct, or that the Soo Line's position is arguably correct and must be committed to binding arbitration. It is difficult to conceive how a legal position such as the Soo Line's, which has received such widespread judicial acceptance, could be deemed "frivolous" or "obviously insubstantial."

Accordingly, the Soo Line has met its "relatively light burden." *Brotherhood of*

*Maintenance of Way*, 802 F.2d at 1022. We find this dispute to be minor and leave it to mandatory arbitration.

We are aware that two courts have concluded that individual lump-sum separation agreements may not coexist with preestablished collective agreements. *Brotherhood of Railway, Airline and Steamship Clerks v. Chesapeake and Ohio Railway Co.*, 115 LRRM 3635 (N.D.Ohio 1983) [available on WESTLAW, 1983 WL 1754]; *Southern Pacific Transportation Co. v. Brotherhood of Railway, Airline and Steamship Clerks*, 636 F.Supp. 57 (D.Utah 1986). In concluding that the disputes were major, these courts found by necessity that management's arguments as to the propriety of its actions were frivolous or obviously insubstantial. As we have tried to show, there is substantial case law which has sustained, or at least found nonfrivolous, arguments similar to those made by management in these two cases. Accordingly, to the extent these cases apply to the situation before us, we decline to follow them.

Moreover, we believe these two cases are distinguishable. The *Chesapeake and Ohio* clerks had "bolted" positions after three years of service, which meant lifetime job protection. The pertinent collective bargaining agreement in the *Southern Pacific* case was a BRAC agreement similar, in its high level of protection, to the agreements in *Chesapeake and Ohio*. By contrast, in this case the IAM machinists were never "bolted." In sum, the two cases are inapposite for the reason that their existing agreements provided a much higher level of protection for employees, thus in effect "closing the door" to a voluntary lump-sum separation plan, while the CBA and Protective Agreement in this case, by virtue of their silence on the subject, can coexist with a voluntary lump-sum separation plan.

C. Contractual Requirement of Arbitration.

There is another, equally persuasive reason why this case must go to arbitration rather than allowing the district court to

vest status quo benefits in one of the parties while "disabling" the other party. The Protective Agreement provides in two places that "any dispute" over the "interpretation" or "application" of the *New York Dock* conditions (which are included as part of the Protective Agreement) *must* be resolved by binding arbitration before an expert railroad arbitation committee.[12] Thus, the Protective Agreement, read as a whole, is unambiguous in requiring that any disputes arising with regard to its interpretation or application must be submitted to binding arbitration.

In *Local No. 381, International Union of Operating Engineers v. Tosco Corp.*, 823 F.2d 265, 268 (8th Cir.1987), this circuit, quoting from the recently decided *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986), held:

> [W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate * * * should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. *Doubts should be resolved in favor of coverage.*"

(Emphasis added.) *Tosco*, again quoting from *AT & T Technologies*, went on to say that "[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is *not* to rule on the potential merits of the underlying claims * * * *even if it appears to the court to be frivolous * * *.*" *Id.* at n. 6. (Emphasis added.) In fact, the Supreme Court said in *AT & T Technologies*, 475 U.S. at 650, 106 S.Ct. at 1419, that where, as here, the arbitration clause refers broadly to any dispute over interpretation, "only the most forceful evidence of a purpose to

exclude the claim from arbitration can prevail." Moreover, as previously noted, this court has held that such language as is present in the Protective Agreement mandates compulsory arbitration.

██ The present dispute clearly falls within the applicable arbitration clauses as a dispute over the "interpretation" of the Protective Agreement. The following three aspects of the Protective Agreement require interpretation to resolve this dispute: (1) the preamble of the Protective Agreement provides that it only applies to employees "adversely affected by the Acquisition;" thus the term "affected" must be interpreted to determine if the eight machinists at issue here were so affected; (2) the preamble of the Protective Agreement seeks as a goal the operation of the expanded railroad "in the most efficient manner," and this language must be interpreted to determine whether it comports with requiring the Soo Line to pay men to remain idle on furlough; and (3) the Protective Agreement as a whole must be examined to determine whether the absence of any language explicitly allowing or forbidding voluntary quits is more properly interpreted to allow or forbid such quits.

Stated more broadly, IAM's main argument is that the Protective Agreement bars the Individual Plan; accordingly, to properly address IAM's argument one must interpret the scope and meaning of the Protective Agreement, and the Protective Agreement states, not once but twice, that any dispute over its scope and meaning must go to binding arbitration. At a minimum, it certainly cannot be said "with positive assurance," as *Tosco* requires, that this is not a dispute over the interpretation of the Protective Agreement. The *New York Dock* conditions themselves contemplate the "retirement" or "resignation" of even

---

12. Article 1, § 11 of the *New York Dock* conditions provides: "In the event the railroad and its employees or their authorized representatives cannot settle *any* dispute or controversy with respect to the *interpretation, application or enforcement* of any provision [herein] * * *, it may be referred by either party to an arbitration committee." (Emphasis added.)

Section 8 of the Protective Agreement provides that "any dispute or controversy with respect to the interpretation [or] application * * * of this Agreement * * * may be referred by any party to an arbitration board [under] Article I, Section 11 of the *New York Dock* Conditions."

As noted previously, *see supra* n. 4, such language has been held by this circuit to impose mandatory arbitration.

those employees who are otherwise eligible for protective payments. Article I, § 6(d) *New York Dock* conditions.

In sum, *Tosco* and *AT & T Technologies* require a court to ask whether there is "positive assurance that the arbitration clause[s]"—which expressly cover disputes over "interpretation"—are "not susceptible of an interpretation that covers the asserted dispute." As we have noted at some length, adjustment boards have held that voluntary individual separation agreements do not violate labor agreements or the RLA. Federal courts have reached the same conclusion or have concluded that similar issues must be arbitrated. Yet, IAM argues here that the Individual Plan violates both the Protective Agreement and the RLA. Resolution of this issue can only be had by examining and interpreting the Protective Agreement. Directly contrary to IAM's assertion, we think that the only response which can be set forth with "positive assurance" is that the arbitration clauses in this case are susceptible of an interpretation that covers the asserted dispute. Accordingly, the arbitration clauses must be given effect and allowed to operate over this dispute.[13]

In the final analysis, whether one relies upon the standard set out for distinguishing a major dispute from a minor dispute, or whether one relies upon the standard for determining whether arbitration clauses cover a dispute, the inquiry is essentially the same. That inquiry, in this case, is whether the Soo Line has set forth a position which is entitled to some credence. We conclude, in view of the cases which explicitly support the Soo Line's position, as well as the pertinent language of the agreements, which arguably support the Soo Line's position, that the Soo Line has more than met its burden under either inquiry.

**13.** Even apart from the arbitration clauses at issue, the RLA itself requires arbitration of the instant dispute. Section 3 of the RLA requires arbitration by expert adjustment boards of any dispute over the "interpretation or application" of railway labor agreements. 45 U.S.C. § 153 First.

## III. CONCLUSION.

Although there is authority for the proposition that this case involves not a dispute, but rather, a choice personal to each employee, we rest our decision on the grounds that this is a dispute which is suitable for arbitration, both because it is a minor dispute and because the parties agreed to arbitration; therefore, we hold that the district court lacked jurisdiction to issue the injunction in this case. Accordingly, the judgment of the district court is reversed, the injunction is dissolved, and the case is remanded for arbitration.

LAY, Chief Judge, with whom McMILLIAN, Circuit Judge, joins, dissenting.

I respectfully dissent.

The majority states the issue to be whether the existing collective bargaining and labor protective agreements cover the right of the railroad to enter into individual contracts with the employees. Maj. op. at 375. However, it is undisputed that neither agreement covers this situation. The majority then posits the issue to be whether or not the labor protective agreement may be interpreted to conflict with the separate contracts entered into by individual employees. If this were the dispute involved, there would be no need to find that such a dispute is subject to arbitration under the labor protective agreement. If this indeed were the issue, then the discussion as to a minor dispute would be unnecessary because the issue would be conceded. But this is not the issue.

The fundamental question is whether the railroad has a unilateral right to enter into voluntary separation agreements with individual employees that significantly affect the rights of other employees.[1] Resolution

**1.** As Judge Heaney stated in the original panel opinion:

The impact on the union and its members of the voluntary separation plan will be significant. As a result of the individual agreements, work has been or will be transferred from one facility to another, seniority and bidding rights of some employees will inevita-

of this issue does not require interpretation of either agreement. If the unilateral action of the carrier is not covered by the agreements, as the majority concedes in its opinion, then it is a misperception to argue that the issue involves interpretation of the agreements. The conduct here is an attempt by the railroad to negotiate with individual employees concerning "an intended change in agreements affecting rates of pay, rules, or working conditions * * *." 45 U.S.C. § 156. The obvious discussion of the definition of minor and major disputes cannot mask the fact that we are dealing with a matter that clearly is subject to mandatory bargaining under section 6 of the RLA.

The majority declines to follow the only two decisions which directly deal with the issue involved.[2] *Southern Pac. Transp. Co. v. Brotherhood of Ry., Airline and Steamship Clerks (So. Pac.)*, 636 F.Supp. 57 (D.Utah 1986); *Brotherhood of Ry., Airline and Steamship Clerks v. Chesapeake and Ohio Ry.*, 115 LRRM 3635 (N.D. Ohio 1983). In attempting to distinguish the decisions, the majority relies upon factual distinctions between the collective bargaining agreements and protective agreements in the instant case and those in the other two cases. Relying upon such differences merely obscures the actual issues involved. These two district court cases have not only rejected the majority's argument but have done so, as the majority has acknowledged, by explicitly stating that the argument is "frivolous or obviously insubstantial." Maj. op. at 380.

In *So. Pac.* a distinguished judge of the district of Utah stated:

> bly be affected, and some employees will, in all probability, be deprived of the opportunity to be separated under the terms of the labor protective agreement. Although the jobs of the remaining employees may be more secure after voluntary separation of some machinists, they would have also become more secure if employees were separated pursuant to the labor protective agreement.
> *International Ass'n of Machinists and Aerospace Workers, Dist. Lodge No. 19 v. Soo Line R.R.*, 833 F.2d 730, 734–35 (8th Cir.1987).

2. The union distinguishes the cases cited by the carrier and relied on by Judge Magill. In re-

[Southern Pacific's (SP) ] actions in negotiating individual separation agreements with its BRAC-represented employees circumvent the existing collective bargaining relations and practices between BRAC and SP, result in a diminution of SP's obligations in the collective bargaining scheme, disturb the status quo between the parties, and undermine BRAC's role as the duly certified representative. Further, SP's actions may cause confusion among SP's employees and disruption in the work force; introduce competition and discrimination that are upsetting to the structure of labor organization; and provide a leverage for taking away advantages under existing collective agreements. Without BRAC's involvement and approval, the terms of the individual agreements may not reflect the strength, bargaining power, and welfare of the employees as a group. Indeed, the practice and philosophy of collective bargaining look with suspicion upon individual agreements. *J.I. Case*, 321 U.S. at 338–39 [64 S.Ct. at 580–81] * * *.

*Southern Pacific*, 636 F.Supp. at 58–59 (citation omitted).

The majority opinion is simply wrong. To allow this error to persist and become precedent under the RLA will be catastrophic. The effect of the opinion is to cast distrust on the fundamental mechanisms Congress has designed to maintain industrial peace under the Railway Labor Act. The district court should be affirmed in all respects.

sponse to the petition for rehearing en banc the union states:

> The common issue in all these opinions is a challenge to the validity of an individual agreement by an individual employee who alleged that he or she was entitled to the benefits of a merger protective agreement. The courts held that a dispute about whether the agreement applied to these particular employees presented a minor dispute, subject to mandatory arbitration. None of these decisions purport to resolve the issue of the employer's duty to bargain about the terms of individual separation agreements.

Response to Petition for Rehearing at 8.

HEANEY, Circuit Judge, dissenting, with whom LAY, Chief Judge, and McMILLIAN and ARNOLD, Circuit Judges, join.

I respectfully dissent. By negotiating the individual severance agreements at issue in this case, Soo Line is attempting to diminish its obligations under the existing collective bargaining agreement (which includes the Labor Protective Agreement) at the expense and to the direct detriment of those who would have qualified for benefits under the Labor Protective Agreement. Such a course of action is clearly prohibited under the RLA.

I

A comparison of the majority and panel opinions reveals that there is no dispute as to the relevant facts. Soo Line determined that as a result of a combination of economic factors and the merger of Soo Line and Milwaukee Railroad, Soo Line had more employees than it needed. Majority opinion at 372. Several hundred of these employees became "unnecessary" as a result of the acquisition. Pursuant to the Labor Protective Agreement, if Soo Line laid off employees and if the layoff resulted from the merger, it was required to pay those employees the equivalent of the wage earned at the time of the adverse action for six years, unless they chose to accept a lump sum payment (valued at about $38,-000). Faced with this obligation, Soo Line unilaterally decided to offer voluntary separation pay plans to certain employees represented by unions other than the IAM. Under the plans, employees who entered into separation agreements would receive $15,000 in severance pay and if they were older than sixty, would have their health and welfare benefits continued for a period of five years. To take advantage of the plans, employees were required to:

Release all rights under labor protective conditions, including but not limited to, statutory, contract, or agreement labor protection and those conditions commonly referred to as Appendix B. * * * [R]esign and relinquish all rights of or claims to employment with the Soo Line

Railroad * * * and release and discharge said railroad company, * * * parent or subsidiaries, from any and all claims of whatsoever kind and nature growing out of or in connection with said employment.

No negotiations were held with the unions representing these employees. Many employees accepted the separation plan and terminated their services with Soo Line. The IAM learned of the program and questioned Soo Line concerning the availability of the program to machinists. Soo Line said it was not available. Thereafter, eight machinists, all over sixty years of age, asked to participate in the severance plan. Soo Line honored their requests and, after signing the necessary releases, their services with the railroad were terminated. Each received a separation allowance of $15,000 and continued eligibility for certain benefits until age sixty-five.

When the IAM learned that the severance plan was being offered to some of its members, it objected. In response to the objection, Soo Line and the Union negotiated, in March and April of 1986, in an effort to reach an acceptable separation agreement. The negotiations were unsuccessful. At no time prior to or during the series of meetings between Soo Line and the IAM did Soo Line issue a notice pursuant to section 6 of the RLA, 45 U.S.C. § 156, triggering the dispute resolution procedures of the RLA. Soo Line thereafter announced its intention to solicit machinists pursuant to its own separation agreement containing essentially the same terms as the agreements signed by other machinists. The IAM then filed this action seeking to restrain Soo Line from entering into separation agreements with individual machinists.

The matter was submitted to the district court on affidavits, exhibits, and abbreviated oral testimony. The parties stipulated that the hearing on the preliminary injunction could also serve as the hearing for a permanent injunction. The district court held that the dispute between the parties was a major one and enjoined Soo Line from entering into individual separation

agreements with employees represented by the IAM until Soo Line complied with the notice and bargaining procedures of section 6 of the RLA, 45 U.S.C. § 156.

The above stated facts are clear that, by negotiating the individual severance agreements, Soo Line reduced its obligations under the Labor Protective Agreement and concurrently benefited select IAM members to the direct detriment of those members who would have otherwise qualified for benefits under the Labor Protective Agreement. It did so despite the fact that the IAM negotiated the Labor Protective Agreement in keeping with the interests of *all* of its members. Moreover, Soo Line knew precisely what it was doing and why. It concedes as much in its petition for rehearing en banc when it states that by taking this action it "avoids the prospect of paying people to sit at home." Petition for Rehearing at 2.

Moreover, those who would have been furloughed under the Labor Protective Agreement but for the individual severance agreements are not the only IAM members affected. As a result of the individual agreements, both work and employees will, in all probability, be transferred from one facility to another and seniority and bidding rights of many IAM members affected. In this light, it is disingenuous to conclude that the individual agreements involved a matter of voluntary choice, personal to each employee. Majority Opinion at n. 9. Rather, it is clear that as a result of the individual agreements, the "rates of pay, rules, and working conditions" of the IAM members as a whole will be significantly affected.

## II

The Supreme Court cases, which are binding upon this Court, are clear that contracts between employers and individual employees covered by collective agreements are suspect. In *J. I. Case Co. v. NLRB*, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944), the Court stated:

> [I]t is urged that some employees may lose by the collective agreement, that an individual workman may sometimes have, or be capable of getting, better terms than those obtainable by the group and that his freedom of contract must be respected on that account * * * but we find that the mere possibility that such agreements might be made no ground for holding generally that individual contracts may survive or surmount collective ones. The practice and philosophy of collective bargaining looks with suspicion on such individual advantages. Of course, where there is great variation in circumstances of employment or capacity of employees, it is possible for the collective bargain to prescribe only minimum rates or maximum hours or expressly to leave certain areas open to individual bargaining. But except as so provided, advantages to individuals may prove as disruptive of industrial peace as disadvantages. They are a fruitful way of interfering with organization and choice of representatives; increased compensation, if individually deserved, is often earned at the cost of breaking down some other standard thought to be for the welfare of the group, and always creates the suspicion of being paid at the long-range expense of the group as a whole. * * * We cannot except individual contracts generally from the operation of collective ones because some may be more individually advantageous. Individual contracts cannot subtract from collective ones.

321 U.S. at 338–39, 64 S.Ct. at 580–81.

It is in light of the above quoted admonition that the Supreme Court set forth the rigorous standard applicable to an employer when it seeks to enter into an individual agreement with an employee who is covered under a collective bargaining agreement. It stated:

> We know of nothing to prevent the employee's, because he is an employee, making any contract provided it is not inconsistent with a collective agreement or does not amount to or result from or is not part of an unfair labor practice. But in so doing the employer may not incidentally exact or obtain any diminution of his own obligation or any increase

of those of employees in the matters covered by the collective agreement.

*Id.; see also Order of Railroad Telegraphers v. Railway Express Agency,* 321 U.S. 342, 345, 64 S.Ct. 582, 585, 88 L.Ed. 788 (1944).

Thus, in view of the fact that Soo Line has, for all practical purposes, admitted it entered into the individual separation agreements in order to diminish its obligations under the Labor Protective Agreement, the practice here at issue is plainly prohibited by *J. I. Case.*

### III

The majority erroneously asserts that:

[T]he presence of the Individual Plan will not deprive any employees of the opportunity to be separated under the terms of the Protective Agreement, for the simple reason that an employee who opts for the Individual Plan is not being deprived, but is making a free choice. An employee who decides against the Individual Plan remains as eligible as ever for the benefits of the Protective Agreement.

Majority Opinion at n. 9.

The vice in the individual agreements, however, is the significant effect they will have upon the collective agreement, and in particular the Labor Protective Agreement. Thus, the question whether the eight IAM members who entered into the individual agreements did so voluntarily or would have been affected by the acquisition is not relevant. The appropriate considerations are the effects of the acquisition and of the individual agreements on the IAM membership as a whole and on their collective rights under the Labor Protective Agreement.[1]

In this regard, Soo Line did not argue below and does not argue here that it sought to reduce its complement of machinists due solely to economic conditions. It rather argues that, whatever the reason for the reduction, it has the right to seek voluntary retirements from the IAM members. The reason for this argument is clear. If Soo Line had not used the individual separation agreements as a means of avoiding the Labor Protective Agreement and had furloughed employees, it could have argued that some or all of the furloughs were unrelated to the merger, and if the Union disagreed, the dispute would have been subject to arbitration pursuant to the terms of the Labor Protective Agreement. But, Soo Line's obligations under the Labor Protective Agreement are not in dispute. Instead, the dispute centers on the question whether Soo Line may entirely ignore the Labor Protective Agreement and reduce its work force by individually negotiating less costly individual retirement agreements, or whether it must follow the seniority principles set forth in the collectively negotiated Protective Agreement and compensate laid-off employees pursuant to it.

The majority would apparently exempt Soo Line from the bargain it struck with the IAM in the Protective Agreement because it results in "the prospect of paying people to sit at home." *Id.* The majority would do so on the basis of the preamble to the Protective Agreement which lists among the general purposes of the agreement to "provide for expedited changes" so that Soo Line may operate "in the most efficient manner." *Id.*

Yet, even if the Protective Agreement could somehow be artfully construed to allow Soo Line to avoid specific provisions in it because they are "inefficient," such a highly interpretative process would not be appropriate unless and until Soo Line's obligations under the Protective Agreement are actually in dispute. Here, Soo Line simply seeks to avoid altogether its obligations under the Protective Agreement by offering selected employees the Individual Plan.

---

1. Thus, the majority's statement that the eight IAM members who took advantage of the Individual Plan would not have been affected by the acquisition and therefore would have been ineligible for benefits under the Protective Agreement simply misses the point. The crux of this dispute is:

 As a result of the Acquisition, the Protective Agreement required that those machinists with less seniority were furloughed first and were being paid a day's wages for not working; however, when the senior eight machinists quit and took the $15,000, [less than half the amount available to those who would have been furloughed under the Protective Agreement] the seniority of the junior machinists was increased by eight and some or all of them may have gone off furlough and back in service.

Majority Opinion at n. 10.

## IV

In light of the foregoing, it is not surprising that the case law relied upon by the majority offers no real support for its position. In *Caterpillar, Inc. v. Williams*, —— U.S. ——, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1977), the Supreme Court simply reiterated the view expressed in *J. I. Case* that individual contracts are valid "provided they are not inconsistent with an existing collective bargaining agreement." Yet, in this case the inconsistency is apparent and egregious.

In *Antonioli v. Lehigh Coal and Navigation Co.*, 451 F.2d 1171 (3d Cir.1971), also relied upon by the majority, former railroad employees appealed the district court's denial of their claims. The claims were based on alleged non-compliance with an ICC protective order and requested allowances for furloughs and dismissals resulting from a merger. The employees' complaint set out three counts. What the majority overlooks is that the Third Circuit found counts I and II were barred by the applicable statute of limitations and count III was barred by the doctrine of res judicata. Thus, the language cited by the majority represents, at most, an alternative rationale to one of the statute of limitation holdings.

Moreover, the cases relied upon in *Antonioli* to support the alternative rationale simply hold that a *union* may enter into an agreement with a carrier that limits the rights of individual employees under a previously executed labor protective agreement. *See Roberts v. Lehigh & New England Railway Co.*, 211 F.Supp. 379 (E.D. Pa.1962), *aff'd*, 323 F.2d 219 (3d Cir.1963); *Clemens v. Central Railroad Co.*, 399 F.2d 825 (3d Cir.1968), *cert. denied*, 393 U.S. 1023, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969); *Nemitz v. Norfolk and Western Railway Co.*, 436 F.2d 841 (6th Cir.), *aff'd*, 404 U.S. 37, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971). Yet, the fact that a union may enter into such an agreement, does not mean that its individual members may do so as well. Rather, the individual agreements here at issue fall within the plain prohibition of *J. I. Case*. Thus, none of the decisions cited by the majority supports its decision that a union does not have the right to object to an employer offering retirement benefits to select members when acceptance of that offer will deprive other members of the union from furlough benefits previously agreed to by the employer and the union.

Finally, the majority asserts that, at best, this case presents a minor dispute to be resolved by the National Railroad Adjustment Board. The question whether the Soo Line is free to negotiate individual separation agreements, however, does not involve interpretation of either the collective bargaining agreement or the Labor Protective Agreement. Instead, it involves an effort to recast these agreements by negotiating individually with parties bound by them. Therefore, Soo Line cannot meet its "relatively light burden" of showing that the dispute concerns the meaning or interpretation of the collective bargaining agreement or the Labor Protective Agreement. *See Brotherhood of Maintenance of Way Employees v. Burlington Northern R. R. Co.*, 802 F.2d 1016, 1022 (8th Cir.1986).

The position taken by the district court—that this case does not present a minor dispute—is supported by the only two district court cases directly on point. *See Brotherhood of Railway, Airline & Steamship Clerks v. Chesapeake and Ohio Railway Co.*, 115 L.R.R.M. (BNA) 3635 (N.D.Ohio 1983); *Southern Pacific Transportation Co. v. Brotherhood of Railway, Airline & Steamship Clerks*, 636 F.Supp. 57 (D.Utah 1986). In contrast, the cases cited by the majority are simply not on point. In *Chambers v. Burlington Northern, Inc.*, 692 F.2d 109, 112 (10th Cir.1982), the dispute involved a "claim by one employee that the railroad had not recognized seniority or paid the allowance to which he was entitled on transfer." *Id.* at 113. *Clausen v. Burlington Northern, Inc.*, 106 L.R.R.M. (BNA) 2496 (D.Mont. 1980), involved an individual transfer agreement under which the employee gave up his seniority, for a lump sum payment of $15,000. (His move did not adversely affect any other employees.) *Thereafter,*

the Union and the employer negotiated an agreement providing transferred employees with a $22,000 payment over three years and retention of seniority. The employee then sought to recover benefits under the newly negotiated agreement. The court held that the case presented a minor dispute for the Railway Adjustment Board. Thus, neither case presented the issue under consideration in this case.

The two cases cited by the majority which do consider disputes similar to this one simply do not help the majority's position. In those cases, the district courts found the employers' contentions—that past practice permitted individual agreements—were not frivolous. *See Transportation–Communication Employees Union v. Grand Trunk Western Railroad Co.*, 679 F.Supp. 696 (E.D.Mich.1988); *International Association of Machinists and Aerospace Workers v. Illinois Central Gulf Railroad Co.*, 102 Lab.Cas. (CCH) ¶ 11,345 (S.D.Ill.1984). Here, the majority correctly recognizes that Soo Line did not claim that the Individual Agreements were authorized by past practice. Majority Opinion at n. 11. Thus, the cases are simply inapposite. Moreover, in light of the applicable statutory authority and case law, it is simply erroneous to interpret the dicta in *Grand Trunk* and *Illinois Gulf Central* as indicating they would reach a similar result if no past practice had existed.

Stripped of its case law support, the majority is left to argue that the plain language of the Labor Protective Agreement requires arbitration. Yet, the plain language only states that any dispute over the "interpretation" or "application" must be resolved by binding arbitration. This case, however, does not present a dispute over interpretation or application of the Labor Protective Agreement. Soo Line simply seeks to ignore the agreement and to reduce its work force through an alternative technique which will diminish its clear obligations under the Labor Protective Agreement. It seeks to do so at the expense of those in the bargaining unit who would have otherwise been entitled to benefits previously bargained for by the IAM with the interests of all its members in mind. The Supreme Court recognized long ago in *J. I. Case* the impropriety of such conduct. This Court should do likewise.

